# CONNECTICUT COALITION AGAINST MILLSTONE ET AL. *v.* CONNECTICUT SITING COUNCIL ET AL.
## (SC 17987)

Norcott, Katz, Palmer, Zarella and Sullivan, Js.

Argued November 27, 2007—officially released March 18, 2008

*Nancy Burton*, pro se, with whom, on the brief, was *William H. Honan*, pro se, for the appellants (plaintiff William H. Honan et al.).

*Robert L. Marconi*, assistant attorney general, with whom was *Jennifer A. Herz*, certified legal intern, for the appellee (named defendant).

*Bradford S. Babbitt*, with whom were *Kenneth C. Baldwin* and, on the brief, *Joey Lee Miranda*, for the appellee (defendant Dominion Nuclear Connecticut, Inc.).

*Opinion*

KATZ, J. The plaintiffs Nancy Burton and William H. Honan,[1] two members of the plaintiff Connecticut

---

[1] The action in the trial court was initiated by the Connecticut Coalition Against Millstone (coalition) and certain of its members, Honan, who lives within ten miles of Millstone Nuclear Power Plant (Millstone), Geralyn Cote Winslow, who lives within two miles of Millstone, and Clarence O. Reynolds, who lives within sixteen miles of Millstone. Thereafter, Burton, another

Coalition Against Millstone (coalition), appeal from the trial court's judgment dismissing the plaintiffs' appeal from the decision of the named defendant, the Connecticut Siting Council (council), granting a certificate of environmental compatibility and public need, pursuant to General Statutes § 16-50k,[2] to the defendant Dominion Nuclear Connecticut, Inc. (Dominion), for the construction of an independent spent fuel storage facility (spent storage facility)[3] for spent nuclear fuel on the site of the Millstone Nuclear Power Plant (Millstone). On appeal to this court, Burton and Honan raise numerous challenges to the trial court's rulings, including that the court improperly: (1) determined that federal law preempted the council's jurisdiction to consider radiological risks and long-term environmental effects of the spent storage facility; (2) concluded that Honan lacked standing under the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq., to bring a claim against the council for procedural irregularities in the hearings because he had failed to show aggrievement; and (3) failed to consider their claim that the council had made findings of public need that were

coalition member, intervened in the administrative appeal to the trial court. The trial court subsequently entered a judgment of nonsuit against the coalition. Only Honan and Burton are parties to the appeal to this court. We, therefore, refer in this opinion to Honan and Burton by name and to all of the persons participating in the trial court proceeding as the plaintiffs.

We also note that the town of Waterford is named as a defendant in this action. By letters dated November 1 and 19, 2007, the town indicated that it had appeared in this appeal for purposes of receiving documents only, but that it would not file briefs nor participate in oral argument, stating: "At this time, the [t]own has no specific interest in the outcome of the appeal of the original order of the [council]."

[2] General Statutes § 16-50k (a) provides in relevant part: "[N]o person shall . . . commence any modification of a facility, that may, as determined by the council, have a substantial adverse environmental effect in the state without having first obtained a certificate of environmental compatibility and public need . . . ."

[3] We note that this type of facility is referred to in the federal regulations; 10 C.F.R. §§ 72.2 and 72.3 (2007); and case law by its acronym, ISFSI, which stands for Independent Spent Fuel Storage Installation.

unsupported by the evidence. We conclude that all of the claims by Honan and Burton are without merit or are otherwise unreviewable, and, accordingly, we affirm the judgment of the trial court.

The record reveals the following procedural history and relevant facts that the council reasonably could have found. Dominion owns and operates Millstone, which is located in the town of Waterford (town). On or about August 25, 2003, Dominion applied to the council for a certificate of environmental compatibility and public need in order to build a dry storage facility for spent nuclear fuel at Millstone. Millstone, which is licensed to operate under the regulations of the Nuclear Regulatory Commission (NRC); see 10 C.F.R. § 50.10 (2007); contains three nuclear fueled electricity generating units, two of which, unit 2 and unit 3, currently are operating. At present, spent fuel from units 2 and 3 is stored "in a separate water-filled pool (wet storage) for each unit" located inside Millstone. Millstone uses wet storage to store both spent fuel and all the fuel in a reactor core in the event of the need for refueling, maintenance or emergency measures; the latter capacity is referred to as "full core reserve." Dominion sought the certificate on the ground that the dry storage facility was necessary to compensate for dwindling space in the wet storage facilities. In order to maintain the functionality of units 2 and 3, Dominion needed additional space to store spent fuel and space in order to preserve its "full core reserve . . . ."

Pursuant to General Statutes § 22a-19 (a)[4] of the Connecticut Environmental Protection Act (CEPA), the

---

[4] General Statutes § 22a-19 (a) provides: "In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting,

coalition and three of its members; see footnote 1 of this opinion; intervened in the proceedings before the council to oppose Dominion's application. The council thereafter issued a written decision outlining extensive findings of fact regarding the need for Millstone and its reliability as an electricity generation facility, spent fuel management alternatives, the siting and design of the proposed spent storage facility, potential environmental impacts of the spent storage facility, and other public health and safety concerns. First, however, with respect to the "[s]cope of its jurisdiction," the council stated: "[T]he federal government has preemptive authority over radiological health and safety issues associated with nuclear power plants. State agencies may not regulate the dry storage activities authorized by the NRC relative to radiological health and safety or impose siting standards in a manner that would frustrate or undermine NRC decisions related to the storage of spent nuclear fuel." Thereafter, the council concluded that the NRC already had established regulations permitting licensed plants to use dry storage systems for spent fuel and regulations concerning the type of dry storage systems and the siting of spent storage facilities. The council also noted that, pursuant to the Nuclear Waste Policy Act of 1982, the federal government is preparing a license application for a facility at Yucca Mountain in Nevada where spent nuclear fuel ultimately can be stored on a permanent basis.

With respect to need and reliability, the council concluded that: Millstone provided approximately 47 percent of Connecticut's actual generation of electricity; Millstone is reliable; Millstone is a near zero emissions source compared to fossil fueled facilities; and both units 2 and 3 could remain in operation until 2025 and 2035, respectively. The council concluded that alterna-

---

impairing or destroying the public trust in the air, water or other natural resources of the state."

tives to the dry storage facility—such as a " 'no build' " alternative and shipment to a national repository—were not viable, at least not currently with respect to the latter.

With regard to the design, siting, and environmental impacts of the spent storage facility, the council concluded that it would be located a safe distance from residential areas, outside of a 500 year flood zone, and outside the existing tidal and inland wetlands and watercourses on the property. The council determined that the construction would have little interference with groundwater; that the design of the facility was sound; and that no endangered, threatened, or special concern species, or historic and archaeological resources would be affected. Finally, the council noted that, although the regulation of radiological safety is under the exclusive jurisdiction of the NRC, the NRC had reevaluated security requirements following the terrorist attacks of September 11, 2001, and had adopted additional security measures.

The council granted the certificate and permitted Dominion to install forty-nine horizontal storage modules in a spent storage facility to keep units 2 and 3 running until 2015 and 2025, respectively, under the conditions that, inter alia: (1) the facility would be temporary and the certificate holder would move the fuel to a national repository as soon as legally possible; (2) the certificate holder would notify the council of the renewal of the licenses for units 2 and 3 by the NRC— at which time the certificate holder could petition for additional horizontal storage modules; and (3) the certificate holder would submit annual reports on the plant's operations, information on the expansion of the spent storage facility, the status of the federal repository and a five year projection on the spent fuel storage requirements of Millstone.

Pursuant to certain provisions of the UAPA, the Public Utility Environmental Standards Act and CEPA, General Statutes §§ 4-183, 16-50q[5] and 22a-19 (a), respectively, the plaintiff intervenors then appealed to the trial court from the council's decision granting the certificate. The plaintiffs contended that the council's decision was illegal, arbitrary and capricious. The plaintiffs alleged that the council improperly had, inter alia: found a public need without substantial evidence; failed to consider adequately "the nature of the environmental impacts"; and construed narrowly "its jurisdiction to preclude consideration of issues related to radiological impacts and consequences." The plaintiffs also alleged procedural irregularities in the proceedings before the council, including a claim that council members Philip Ashton and Edward Wilds improperly had failed to disqualify themselves despite their past connections with Millstone and Dominion, respectively.[6]

Thereafter, the plaintiffs moved to stay the council's orders permitting Dominion to proceed with construction, pending the outcome of the appeal, and the defendants moved to dismiss the plaintiffs' appeal. Following a hearing on the motion to stay, the court denied the plaintiffs' request on the ground that they were unlikely to prevail on the merits of their claims.[7] While the

[5] General Statutes § 16-50q provides: "Any party may obtain judicial review of an order issued on an application for a certificate or an amendment of a certificate in accordance with the provisions of section 4-183. Any judicial review sought pursuant to this chapter shall be privileged in respect to assignment for trial in the Superior Court."

[6] The plaintiffs claimed that Ashton's prior employment by Northeast Utilities, an entity that formerly owned Millstone, disqualified him from considering Dominion's spent storage facility application to the council. They claimed that Wild's visits to Millstone and to another Dominion dry storage facility prior to Dominion's application disqualified him.

[7] The presentation of evidence on the motion to stay took several months. During that time, the construction of the spent storage facility was completed and the fuel transferred. The trial court, however, did not declare the motion to stay moot because it concluded that practical relief still could be granted if it were to order that the land could not be used for the spent storage facility pending a decision on the merits of the appeal. The trial denied the

motion to stay was pending, the plaintiffs also moved for a temporary restraining order against the council's decision. By stipulation of the parties, the trial court deemed the motion for a restraining order moot because it concerned substantially the same issues as the motion to stay.

At this point, Burton intervened in the action, pursuant to § 22a-19 (a), appearing pro se.[8] Thereafter, the trial court granted in part and denied in part the defendants' motion to dismiss the plaintiffs' appeal. The trial court first noted that it was declining to address some of the plaintiffs' claims because they had failed to brief them adequately. The trial court then concluded that federal law preempted the council from considering the radiological risks and the long-term environmental effects of the project and, therefore, dismissed the plaintiffs' claims that the council improperly had failed to consider these issues. With respect to the claim of bias against council members Ashton and Wilds, the court concluded that the plaintiffs Geralyn Cote Winslow and Honan lacked the requisite aggrievement to have standing to bring that claim under the UAPA.[9] Specifically, the court concluded that the spent storage facility posed no specific and personal risk to Winslow and Honan different from that previously posed by the fuel storage methods employed by Dominion. The trial court concluded, however, that the plaintiffs did have standing

motion because the plaintiffs had failed to demonstrate: (1) a likelihood of success on the merits as to the claims of radiological risks, environmental effects, and bias or prejudice; (2) irreparable injury; and (3) nondetrimental effects of the stay on other parties.

[8] Patricia Kane, an attorney who then represented the plaintiffs, had filed a motion to have Burton admitted pro hac vice. The trial court denied this motion.

[9] While the trial court concluded that Winslow and Honan's testimony did not establish aggrievement, it also concluded that the plaintiff Clarence O. Reynolds had introduced no evidence of aggrievement whatsoever and thus also had failed to meet his burden in that regard.

under CEPA to raise their claim of bias. In so doing, the trial court relied both on this court's decision in *Rocque* v. *Northeast Utilities Service Co.*, 254 Conn. 78, 85, 755 A.2d 196 (2000), in which we had assumed without deciding that procedural claims constitute an environmental issue for purposes of standing under CEPA, and on the general rule of indulging every presumption in favor of jurisdiction.

Prior to the court's hearing on the merits of the plaintiffs' claim of bias, Burton moved for an immediate remand and a stay of the proceedings to allow the council to consider new evidence that Dominion routinely had deactivated its perimeter security system due to false alarms triggered by gusts of wind and other weather conditions. After holding an evidentiary hearing, the trial court denied the motion concluding that the plaintiffs had failed to prove actual bias necessary to overcome the presumption that members of administrative bodies are unbiased, and, accordingly, it dismissed the plaintiffs' appeal.

Burton and Honan then appealed from the trial court's judgment dismissing the plaintiffs' appeal to the Appellate Court.[10] We transferred the appeal to this court, pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

Honan and Burton raise three principal claims on appeal to this court. First, they contend that the trial court improperly determined that the council is preempted by the federal Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq. (Atomic Energy Act), and the relevant regulations of the NRC from considering the radiological risks of the dry storage facility and the related

---

[10] While the appeal was pending, the Appellate Court granted in part Dominion's motion to strike the claim, raised for the first time in Burton and Honan's reply brief, that the trial court improperly had rejected the plaintiffs' claims of bias against Ashton and Wilds.

potential impact on the environment. With respect to this claim, Honan and Burton contend that, although the council lacks jurisdiction to *regulate* radiological risks, it is permitted to consider such risks in accordance with General Statutes § 16-50p (a) (3) (B),[11] and that, in making its determination regarding preemption, the trial court misconstrued the body of Supreme Court precedent in this area, the statutes prescribing the jurisdiction of federal agencies—the Environmental Protection Agency and the NRC—and the jurisdiction ascribed to the council under state law. Second, Honan contends that the trial court improperly concluded that he had failed to show the aggrievement necessary to bring his claim of procedural irregularity in terms of the potential bias of council members Ashton and Wilds under the UAPA. Third, Honan and Burton contend that it was improper for the trial court to refuse to consider their claim that there was not substantial evidence before the council on the issue of the public benefit of the proposed spent storage facility. They submit that there was evidence that unit 2 of the plant was not necessary to the reliability of the electricity supply in Connecticut, and therefore, the spent storage facility was not necessary to sustain that unit. We reject these claims on the merits. Finally, Honan and Burton also raise numerous other claims in this appeal, which, for reasons set forth later in this opinion, we do not consider because they are briefed inadequately.

---

[11] General Statutes § 16-50p (a) (3) provides in relevant part: "The council shall file, with its order, an opinion stating in full its reasons for the decision. The council shall not grant a certificate, either as proposed or as modified by the council, unless it shall find and determine . . .

"(B) The nature of the probable environmental impact of the facility alone and cumulatively with other existing facilities, including a specification of every significant adverse effect, including, but not limited to, electromagnetic fields that, whether alone or cumulatively with other effects, on, and conflict with the policies of the state concerning, the natural environment, ecological balance, public health and safety, scenic, historic and recreational values, forests and parks, air and water purity and fish, aquaculture and wildlife . . . ."

At the outset, we set forth the applicable standard of review with regard to the trial court's review of the findings of fact and conclusions of law of the council. "[J]udicial review of the [council's] action is governed by the [UAPA, General Statutes §§ 4-183 (j), 4-184], and the scope of that review is very restricted. . . . [R]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact. . . . Our ultimate duty is to determine, in view of all of the evidence, whether the agency, in issuing its order, acted unreasonably, arbitrarily, illegally or in abuse of its discretion." (Internal quotation marks omitted.) *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, 283 Conn. 672, 690–91, 931 A.2d 159 (2007). When an issue, such as federal preemption, implicates the agency's subject matter jurisdiction, however, our review is plenary. Id., 685.

I

Honan and Burton claim that the trial court improperly determined that the council lacked jurisdiction to consider *any* environmental effects of the proposed spent storage facility in making its decision to issue the certificate.[12] They contend that under § 16-50p, the

---

[12] Specifically, Honan and Burton claim that: (1) considering radiological risks under § 16-50p (a) does not require the council to "regulate" in the area of radiological risks; (2) the trial court improperly relied on *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Commission*, 461 U.S. 190, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983), because that case did not conclude there was preemption; (3) the trial court failed to consider that the NRC and the federal Environmental Protection Agency "share" jurisdiction over radiation releases from nuclear power plants; and (4) the council failed to consider any and all environmental impacts. We consider these specific contentions together.

council can and must consider such environmental effects, regardless of their relation to radiological risks.

We conclude at the outset, however, that Honan and Burton have characterized the trial court's holding more broadly than it reasonably may be read. The trial court did not conclude that the council could not consider *any* environmental effects; rather, it held that the council was preempted from considering radiological risks and *related* environmental effects[13]—i.e., environmental effects related to radiological risks. Indeed, the trial court was mindful of the extensive findings regarding the aspects of environmental effects that the council expressly had considered. Therefore, we have limited our consideration to their claim as it relates to whether the trial court properly concluded that the council was preempted from considering radiological risks and related environmental effects. We conclude that the trial court properly determined that the federal law preempted that aspect of the council's jurisdiction.

This case requires that we construe the subject matter jurisdiction of the council in light of the Atomic Energy Act and the relevant regulations of the NRC duly promulgated pursuant thereto. "The question of preemption is one of federal law arising under the supremacy clause

---

[13] The trial court pointed out that the Supreme Court has made it clear that the NRC has exclusive authority over "matters directly affecting the radiological safety of nuclear plant construction . . . ." It then stated that "[t]o accept the position of the plaintiffs . . . that the council can regulate the environmental effects of a nuclear facility would, by extension, permit the council to veto on the ground of an environmental concern, a nuclear facility already approved by the NRC . . . . Accordingly, it is held that the council is preempted from regulating the environmental effects of the facility, and it was not error for the council to refuse to consider them." Although we agree that the latter statements, taken alone, are susceptible to a broad reading, the only reasonable reading of those statements, when read in context with the court's decision in its entirety and the detailed findings of the council addressing environmental impact at length before the court, was that the trial court was referring to environmental effects related to radiological risks.

of the United States constitution. . . . Determining whether Congress has exercised its power to preempt state law is a question of legislative intent." (Internal quotation marks omitted.) *Cox Cable Advisory Council v. Dept. of Public Utility Control*, 259 Conn. 56, 62, 788 A.2d 29, cert. denied, 537 U.S. 537, 123 S. Ct. 95, 154 L. Ed. 2d 25 (2002). The Supreme Court has limited preemption to three circumstances. *English v. General Electric Co.*, 496 U.S. 72, 78, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990). First, state law is preempted "when Congress has made its intent known through explicit statutory language . . . ." Id., 79. Second, a state law implicitly is preempted when it "regulates conduct in a field that Congress intended the [f]ederal [g]overnment to occupy exclusively." Id. The intent to occupy a particular field "may be inferred from a scheme of federal regulation . . . so pervasive as to make reasonable the inference that Congress left no room for the [s]tates to supplement it, or where an [a]ct of Congress touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." (Internal quotation marks omitted.) Id.

Even with implied field preemption, however, when Congress has legislated "in a field which the [s]tates have traditionally occupied . . . [a court starts] with the assumption that the historic police powers of the [s]tates were not to be superseded by the [f]ederal [a]ct unless that was the clear and manifest purpose of Congress." (Citations omitted.) *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947); see also *Times Mirror Co. v. Division of Public Utility Control*, 192 Conn. 506, 512, 473 A.2d 768 (1984) ("[c]ourts should not readily infer that Congress has deprived the states of the power to act on interests deeply rooted in local feeling and responsibility which only peripherally concern an area controlled by noncon-

flicting federal legislation" [internal quotation marks omitted]); accord, e.g., *Serrano* v. *Serrano*, 213 Conn. 1, 6, 566 A.2d 413 (1989) ("[t]he United States Supreme Court has repeatedly held that, because the field of domestic relations has traditionally been regulated by the states, the standard for demonstrating a preempting conflict between federal law and a state domestic relations provision is high").

Third, and finally, a state law may be preempted when "it is impossible for a private party to comply with both state and federal law . . . and where under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. . . . What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ." (Citations omitted; internal quotation marks omitted.) *Crosby* v. *National Foreign Trade Council*, 530 U.S. 363, 372–73, 120 S. Ct. 2288, 147 L. Ed. 2d 352 (2000). With these principles in mind, we turn to the question of whether the trial court improperly determined that federal law preempted the council from considering radiological risks or related environmental effects of the spent storage facility.

Neither the relevant federal statutes nor the administrative regulations expressly preempt the council in this regard.[14] Therefore, we must determine whether these issues fall within a field that Congress implicitly intended to occupy or, in the alternative, whether the principles of conflict preemption apply.

---

[14] Indeed, Congress and the states expressly have acknowledged other delegations of power in this area. See General Statutes § 22a-161 et seq. (interstate compact over low level radioactive waste management); 42 U.S.C. § 2021 (b) (authorizing NRC to enter into agreements with states to allow states to assume regulatory authority in specific areas).

We begin with the federal statute itself. Under the Atomic Energy Act, Congress established a comprehensive statutory scheme for federal regulation of the safe "development, use, and control of atomic energy . . . ."[15] 42 U.S.C. § 2011 (a) and (b). "Until 1954 . . . the use, control, and ownership of nuclear technology remained a federal monopoly. The Atomic Energy Act . . . grew out of Congress' determination that the national interest would be best served if the [g]overnment encouraged the private sector to become involved in the development of atomic energy for peaceful purposes under a program of federal regulation and licensing." (Citation omitted.) *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Commission,* 461 U.S. 190, 206–207, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983). The Atomic Energy Act broke the federal monopoly on atomic energy, thereby "[promoting] the civilian development of nuclear energy, while seeking to safeguard the public and the environment from the unpredictable risks of a new technology." Id., 194. The Atomic Energy Act granted the Atomic Energy Commission—now the NRC[16]—"exclusive jurisdiction to license the transfer, delivery, receipt, acquisition, possession, and use of nuclear materials." (Internal quotation marks omitted.) *Silkwood* v. *Kerr-McGee Corp.,* 464 U.S. 238, 249–50, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984); see also 42 U.S.C. §§ 2131, 2133 (setting forth licensing provisions). The NRC also is authorized to "establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byprod-

---

[15] " '[A]tomic energy' " is defined as "all forms of energy released in the course of nuclear fission or nuclear transformation." 42 U.S.C. § 2014 (c).

[16] The NRC was created pursuant to the Energy Reorganization Act of 1974, Pub. L. No. 93-438, 88 Stat. 1233 (1974). See 42 U.S.C. § 5841 (a). That act vested the NRC with the Atomic Energy Commission's previous authority to issue commercial licenses under the Atomic Energy Act. See 42 U.S.C. §§ 5814 and 2073.

uct material as the [NRC] may deem necessary or desirable . . . to protect health or to minimize danger to life or property . . . ." 42 U.S.C. § 2201 (b). The NRC also is authorized "to require that the manufacturer, processor, or producer of any equipment, device, commodity, or other product containing source, byproduct, or special nuclear material shall not transfer possession or control of such product except pursuant to a license issued by the [NRC]." 42 U.S.C. § 2021 (c). The Supreme Court has recognized that "[t]he [NRC's] prime area of concern in the licensing context . . . is national security, public health, and safety." (Internal quotation marks omitted.) *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Commission*, supra, 207.

"While the [Atomic Energy Act] does not specifically refer to the storage or disposal of spent nuclear fuel, it has long been recognized that [that act] confers on the NRC authority to license and regulate the storage and disposal of such fuel. . . . Pursuant to its [Atomic Energy Act] authority, the NRC promulgated regulations in 1980 for licensing onsite and away-from-reactor spent nuclear fuel storage facilities for private nuclear generators. See 10 C.F.R. Part 72." (Citations omitted.) *Bullcreek* v. *Nuclear Regulatory Commission*, 359 F.3d 536, 538 (D.C. Cir. 2004). NRC regulations specifically authorize privately owned and operated plants to use spent storage facilities to store spent nuclear fuel.[17] Those regulations provide that "[a] general license is

---

[17] "In 1982, Congress passed the Nuclear Waste Policy Act . . . 42 U.S.C. §§ 10101 [through] 10270 [which] requires the United States Department of Energy to construct a permanent storage facility for the disposal of [spent nuclear fuel]." *Skull Valley Band of Goshute Indians* v. *Nielson*, 376 F.3d 1223, 1227 (10th Cir. 2004). In *Bullcreek* v. *Nuclear Regulatory Commission*, supra, 359 F.3d 538–39, the District of Columbia Circuit Court of Appeals concluded that the Nuclear Waste Policy Act does not repeal any of the authority of the NRC under the Atomic Energy Act "to license private away-from-reactor storage facilities."

hereby issued for the storage of spent fuel in [a spent storage facility] at power reactor sites to persons authorized to possess or operate nuclear power reactors under part 50 of this chapter."[18] 10 C.F.R. § 72.210 (2007). The NRC also has issued a list of casks specifically approved for the storage of spent fuel, under conditions specified in applicable federally issued certificates of compliance. 10 C.F.R. § 72.214 (2007). Finally, under 10 C.F.R. § 72.212 (2007), the NRC has established conditions on the general licenses issued for spent storage facilities, such as the adoption of security measures.[19] See also 10 C.F.R. § 73.55 (2007) (requirements for physical protection of licensed activities in nuclear power reactors against radiological sabotage).

At the same time, the Atomic Energy Act expressly reserves some authority to the states, permitting them "to regulate activities for purposes other than protection against radiation hazards." 42 U.S.C. § 2021 (k).[20] In three cases, the Supreme Court has examined the

---

[18] The Supreme Court has "held repeatedly that state laws can be preempted by federal regulations as well as by federal statutes." *Hillsborough County* v. *Automated Medical Laboratories, Inc.*, 471 U.S. 707, 713, 105 S. Ct. 2371, 85 L. Ed. 2d 714 (1985).

[19] The record reveals that the NRC issued an order, dated October 31, 2003, modifying Dominion's general license for the spent storage facility to require additional safeguards in the wake of the terrorist attacks of September 11, 2001. See http://www.nrc.gov/reading-rm/doc-collections/enforcement/security/2003/ea03173_letter_ML032260572.pdf (last visited March 7, 2008).

[20] The Atomic Energy Act permits the NRC to enter into agreements with individual states to vest them with regulatory authority over certain nuclear materials; 42 U.S.C. § 2021 (b); but does not permit transfer of authority in matters involving "the disposal of such other byproduct, source, or special nuclear material as the [NRC] determines by regulation or order should, because of the hazards or potential hazards thereof, not be so disposed of without a license from the [NRC]." 42 U.S.C. § 2021 (c) (4); see also 10 C.F.R. § 72.1 et seq. (2007). Connecticut does not have such an agreement with the NRC. See http://www.hsrd.ornl.gov/nrc/rulemaking.htm#CT (last visited March 7, 2008).

breadth of the states' authority under this statutory and regulatory scheme in the preemption context. Most significant for purposes of the present case is *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Commission*, supra, 461 U.S. 198, wherein the court determined that the federal scheme did not preempt a California law imposing a moratorium on the construction of nuclear power plants until there has been a finding by the state energy commission that " 'there exists a demonstrated technology or means for the disposal of high-level nuclear waste.' "

In examining the federal scheme, the court concluded that: "Congress has preserved the dual regulation of nuclear-powered electricity generation: the [f]ederal [g]overnment maintains complete control of the safety and 'nuclear' aspects of energy generation; the [s]tates exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like." Id., 211–12. The court noted that, had the California law sought only to regulate the construction or operation of a nuclear power, even if enacted out of nonsafety concerns, it would fall squarely within a field occupied by the federal scheme and would be preempted. Id., 212–13. Because the court accepted California's avowed purpose that the law was enacted to address economic concerns rather than radiation hazards from nuclear waste disposal, the court concluded that the law fell outside the scope of the federal field. Id., 213–17. The court further concluded that the law was not barred by conflict preemption because a decision by California that it was *economically* unwise to proceed with the construction of a nuclear power plant on the basis of waste disposal concerns would not conflict with a decision of the NRC that it was *safe* to do so. Id., 218–20. Finally, the court determined that the California law would not necessarily frustrate the objec-

tives of Congress in enacting the Atomic Energy Act to promote nuclear power. Id., 222–23.

Thereafter, in two cases implicating the intersection between state tort law and the federal regime governing nuclear hazards, the Supreme Court rejected a broad characterization of the implied preemption of the field of nuclear safety. In *Silkwood* v. *Kerr-McGee Corp.*, supra, 464 U.S. 255–57, the Supreme Court concluded that state common-law punitive damage awards were not preempted by federal regulations on the safe handling of nuclear material in a suit by the administrator of an employee's estate against her employer, a nuclear power plant, for personal and property injuries related to plutonium contamination as a result of the plant's negligence. The court concluded that, although Congress' intent to regulate nuclear safety *would* suggest that the tort action was preempted; id., 250–51; there was persuasive evidence that Congress specifically had intended to preserve state tort remedies and to tolerate whatever tension there was between the two concepts. Id., 255–56.

In *English* v. *General Electric Co.*, supra, 496 U.S. 76–86, the Supreme Court concluded that a nuclear facility employee's intentional infliction of emotional distress claim arising from her allegedly retaliatory discharge for making nuclear safety complaints was not preempted within the meaning of *Pacific Gas & Electric Co.* The court stated that, "for a state law to fall within the pre-empted zone, it must have some direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." Id., 85. In *English*, the court determined that the effect was neither direct nor substantial enough to place the petitioner's claim in the preempted field, noting, however, that it would be inconsistent for Congress to have permitted state remedies like those recognized in *Silkwood*, which would have a far more

direct effect on safety regulations, and not to permit the more tangential claim in *English*. Id., 86. The court further concluded that the Atomic Energy Act's remedy for whistleblowers and its restrictions on recovery did not create a preemption conflict with the state tort law remedy. Id., 87–90. Thus, the court clarified that the state's motivation was not dispositive, but, rather, pre-emption depended on the linkage to, or the actual effect on, issues of nuclear safety.

In light of the federal legislation and regulations, and the Supreme Court's decisions interpreting them, we conclude that Congress impliedly intended to occupy the field of radiological risks and environmentally related effects of the storage of spent nuclear fuel, including the radiological effects of a potential terrorist attack on a storage facility authorized by the NRC. Our conclusion is based on the broad mandate in the Atomic Energy Act for the NRC "to have complete control of the safety and 'nuclear' aspects of energy generation"; *Pacific Gas & Electric Co.* v. *State Energy Resources Conservation & Development Commission*, supra, 461 U.S. 212; and the regulations that specifically authorize spent storage facilities; 10 C.F.R. § 72.210 (2007); for privately owned and operated plants. That authority and the regulations promulgated thereunder approving the use of spent storage facilities make clear that Congress did not intend for the states to have regulatory or decision-making power in this field. Given this conclusion and in accordance with the Supreme Court's decisions, therefore, we must determine in the present case not whether the state legislation *peripherally* concerns the federal scheme, but whether it has some "direct and substantial effect" on it. *English* v. *General Electric Co.*, supra, 496 U.S. 85.

The provisions of state law that form the basis for the parties' dispute are contained in the Public Utility Environmental Standards Act, General Statutes § 16-

50g et seq. The legislature's stated purposes in enacting the Public Utility Environmental Standards Act were, inter alia: "To provide for the balancing of the need for adequate and reliable public utility services at the lowest reasonable cost to consumers with the need to protect the environment and ecology of the state and to minimize damage to scenic, historic, and recreational values; to provide environmental quality standards and criteria for the location, design, construction and operation of facilities for the furnishing of public utility services at least as stringent as the federal environmental quality standards and criteria . . . ." General Statutes § 16-50g.

The Public Utility Environmental Standards Act also establishes the siting council; General Statutes § 16-50j; and vests the council with near exclusive jurisdiction, amongst state agencies, over the "location and type of modifications" to existing electricity generating facilities as set forth in General Statutes § 16-50i (a) (3). General Statutes § 16-50x (a). Thus, no modifications to existing facilities "that may, as determined by the council, have a substantial adverse environmental effect in the state" are permitted "without having first obtained a certificate of environmental compatibility and public need . . . ." General Statutes § 16-50k (a). Section 16-50p (a) (3) provides in relevant part that "[t]he council shall not grant a certificate, either as proposed or as modified by the council, unless it shall determine . . . (B) [t]he nature of the probable environmental impact of the facility alone and cumulatively with other existing facilities, including a specification of every significant adverse effect, including, but not limited to, electromagnetic fields that, whether alone or cumulatively with other effects on, and conflict with the policies of the state concerning, the natural environment, ecological balance, public health and safety, scenic, historic and recreational values, forests and parks,

air and water purity and fish, aquaculture and wildlife; [and] (C) [w]hy the adverse effects or conflicts referred to in subparagraph (B) of this subdivision are not sufficient reason to deny the application . . . ."

Therefore, if the council were to *consider*, in accordance with § 16-50p, environmental effects related to radiological risks in its decision whether to issue the certificate, it might deny Dominion's request based upon the conclusion that such environmental effects could ensue. Such a decision essentially would void the NRC's regulation permitting Dominion to construct a spent storage facility to store its fuel. In turn, such a decision, undoubtedly, would have a direct and substantial effect on the federal scheme to promote the safe development of nuclear power. Therefore, considerations of environmental risks related to radiological safety fall squarely within the field preempted by federal law. Indeed, a decision by the council denying the certificate on the basis of environmental effects caused by radiation hazards actually would conflict with the NRC's regulations expressly authorizing such facilities as a safe method of storing spent nuclear fuel. See *Crosby* v. *National Foreign Trade Council*, supra, 530 U.S. 372–73.

Accordingly, with respect to environmental concerns, we conclude that the council's jurisdiction is limited to *nonnuclear* environmental effects. In the present case, the council made findings of fact limited to the following factors: the distance of the facility from residential areas, the flood zone, and tidal and inland wetlands; the impact of the facility on groundwater; the design of the facility; the impact on endangered, threatened or concerned species; and the impact on historic and archaeological resources. To the extent that these nonnuclear environmental factors were considered separately from any radiation hazards, the council acted within its jurisdiction.

This conclusion is in accord with that reached by federal courts that have addressed similar circumstances. In *Maine Yankee Atomic Power Co.* v. *Bonsey*, 107 F. Sup. 2d 47, 49 (D. Me. 2000), the plaintiff plant operator sought declaratory and injunctive relief, on the basis of federal preemption, to prevent the defendant state agencies, Maine's environmental protection board and the state's department of environmental protection, from asserting jurisdiction over the plaintiff's permit application to construct a spent storage facility to store fuel from a decommissioned nuclear facility. The court determined that the defendants were preempted from asserting jurisdiction either directly or indirectly over nuclear safety issues reserved exclusively to the NRC. Id., 55. Thus, the defendants were not permitted to regulate whether the plaintiff plant "should use dry cask storage . . . or some other storage vehicle . . . . Nor [do the defendants] have any authority to prevent an on-site transfer of the spent fuel . . . [or] any say in the selection [and] specifications regarding construction of the dry cask storage containers . . . or regarding whether the site and the installation, including cask storage pads, are adequate to withstand the weight of the casks, or threats posed by natural phenomena such as earthquakes and tornados, or the threat of sabotage." (Citations omitted.) Id. The court also concluded that the defendants could not use financial concerns to regulate "indirectly" a spent fuel facility that the NRC already had approved, but that it could impose requirements on areas unconnected with "radiological, operational, construction or safety issues, such as . . . aesthetic landscaping requirements, or flood or soil erosion control measures." Id. Because the states do retain some authority under the Atomic Energy Act, the assertion of jurisdiction in some respects over the permit application was not improper, and the court declined to issue the declaratory and injunctive relief sought. Id., 55–56.

We agree with the District Court's conclusions in *Maine Yankee Atomic Power Co.*—which address highly similar circumstances to those in the present case—about the scope of authority of the states over the construction of spent storage facilities. Indeed, several other courts have reached similar conclusions as to the delineations of preemption under the Atomic Energy Act. See, e.g., *Skull Valley Band of Goshute Indians* v. *Nielson*, 376 F.3d 1223, 1228–30, 1246–54 (10th Cir. 2004) (state statutes regulating storage and transportation of spent nuclear fuel preempted because they regulated nuclear safety concerns), cert. denied sub nom. *Nielson* v. *Private Fuel Storage, LLC*, 546 U.S. 1060, 126 S. Ct. 790, 163 L. Ed. 2d 626 (2005); *United States* v. *Kentucky*, 252 F.3d 816, 824 (6th Cir. 2001) (Kentucky not preempted completely from regulating solid waste disposal from active uranium enrichment facility, but preempted under Atomic Energy Act from regulating radioactive component of that waste), cert. denied, 534 U.S. 973, 122 S. Ct. 396, 151 L. Ed. 2d 300 (2001); *Suffolk* v. *Long Island Lighting Co.*, 728 F.2d 52, 55, 60 (2d Cir. 1984) (action for "injunctive and rate relief" on basis of common law tort and contract principles preempted in part under Atomic Energy Act to extent predicated on public safety concerns); *Missouri* v. *Westinghouse Electric, LLC*, 487 F. Sup. 2d 1076, 1087–88 (E.D. Mo. 2007) (Missouri preempted from controlling decontamination of site contaminated by radiological materials and required to avoid conflict with federal law in regulating nonradiological materials at same site).

Honan and Burton contend, however, that the federal Environmental Protection Agency's concurrent jurisdiction over certain radiological effects of nuclear facilities indicates that the Atomic Energy Act does not preempt this field. We disagree that that federal agency's jurisdiction has any bearing on the line

between the *federal* government and *state* governments in the field of nuclear regulation. The Environmental Protection Agency's regulations addressing radiation releases from plants; see 40 C.F.R. § 190.01 et seq. (2006);[21] may speak to the breadth of the NRC's authority in the *federal* realm, but they do not bear on what authority Congress intended to leave to the *states*. Cf. 42 U.S.C. § 2021 (b), (c) and (k) (indicating authority preserved or potentially allocated to states). If anything, the Environmental Protection Agency's authority indicates broader federal control in this area and supports the argument that the states *are* preempted from regulating environmental effects associated with nuclear radiation hazards.

Honan and Burton also contend that the Ninth Circuit Court of Appeals' decision in *San Luis Obispo Mothers for Peace* v. *Nuclear Regulatory Commission*, 449 F.3d 1016, 1028–35 (9th Cir. 2006), cert. denied sub nom. *Pacific Gas & Electric Co.* v. *San Luis Obispo Mothers for Peace*, 549 U.S. 1166, 127 S. Ct. 1124, 166 L. Ed. 2d 891 (2007), wherein the court determined that the NRC improperly had failed to comply with certain provisions of the National Environmental Policy Act concerning the consideration of environmental effects of a terrorist attack, supports their contention that the council was required to consider those potential environmental effects on the spent storage facility in the present case. We fail to see any relation between that case and the subject matter jurisdiction of the council. The NRC's need to comply with federal legislation does not cede its authority to the states. For the foregoing reasons, we conclude that the trial court properly affirmed the

[21] The Environmental Protection Agency's regulations apply to "radiation doses received by members of the public in the general environment and to radioactive materials introduced into the general environment as the result of operations which are part of a nuclear fuel cycle." 40 C.F.R. § 190.01 (2006).

council's interpretation of its jurisdiction to exclude radiological risks and their related environmental effects and, accordingly, its decision not to consider them under § 16-50p.

## II

We next turn to Honan's claim that the trial court improperly determined that he did not make the showing of aggrievement necessary for standing under the UAPA to litigate a claim of procedural irregularities in the council's proceedings. Honan contends that the trial court improperly imposed a novel requirement that he must establish that the spent storage facility posed a risk to his interests that was different from the risk that was posed by the operation of the plant prior to the construction of the spent storage facility. It is clear from the record, however, that we need not decide whether Honan established aggrievement under the UAPA, because the trial court concluded that Honan had standing under CEPA to litigate the same claim of bias and rejected that claim on the merits. Accordingly, Honan's claim regarding standing under the UAPA is moot.[22]

The record reveals the following procedural history that is relevant to our determination. After the trial court concluded that the plaintiffs had standing under CEPA to raise their claim of bias against two council members, Ashton and Wilds, the trial court granted the plaintiffs' request to supplement the record and heard

[22] Honan also had raised the claim in his reply brief that the trial court improperly had rejected his bias claim on the merits. We note that, by order dated July 17, 2007, the Appellate Court granted Dominion's motion to strike that part of the reply brief raising for the first time the issue of the trial court's determination of the disqualification issue. See footnote 10 of this opinion. See *Statewide Grievance Committee* v. *Burton*, 282 Conn. 1, 19 n.7, 917 A.2d 1 (2007) (citing "well established principle that arguments cannot be raised for the first time in a reply brief" [internal quotation marks omitted]). Accordingly, that issue is not before us on appeal.

additional evidence on the bias claim. During the course of a three day hearing, the court heard testimony from Ashton and Wilds and reviewed documentary evidence submitted by the parties. At the close of the hearing, the trial court issued an extensive memorandum of decision weighing the evidence and dismissing the plaintiffs' claim on the ground that they had not overcome the presumption of nonbias.

A case is considered moot if an appellate court cannot grant the appellant "any practical relief through its disposition of the merits . . . ." (Internal quotation marks omitted.) *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 279, 933 A.2d 256 (2007); see *Seymour* v. *Region One Board of Education*, 261 Conn. 475, 481, 803 A.2d 318 (2002). "Mootness implicates this court's subject matter jurisdiction, raising a question of law over which we exercise plenary review." (Internal quotation marks omitted.) *Windels* v. *Environmental Protection Commission*, supra, 279.

In the present case, Honan could be afforded no practical relief by a reversal on the trial court's determinations concerning classical aggrievement under the UAPA, because he already has litigated the underlying claim. See *Jones* v. *Ricker*, 172 Conn. 572, 576–77, 375 A.2d 1034 (1977) (appeal of motion to intervene denied as moot when underlying action had been fully litigated, and relief had been granted and executed). Indeed, not only was he permitted to bring an identical claim under CEPA, but he also received what essentially constituted a hearing de novo on that claim. Allowing Honan to proceed under the UAPA could grant him no greater process or more deferential standard of review for this claim; see General Statutes § 4-183 (i);[23] nor has he

---

[23] General Statutes § 4-183 (i) provides in relevant part: "If alleged irregularities in procedure before the agency are not shown in the record or if facts necessary to establish aggrievement are not shown in the record, proof limited thereto may be taken in the court. The court, upon request, shall hear oral argument and receive written briefs."

pointed us to any relief or benefit that our review of this claim could afford him.[24] Accordingly, Honan's aggrievement claim is dismissed as moot.

### III

Honan and Burton also contend that the trial court improperly declined to consider whether the council had before it substantial evidence to support the findings of public benefit required by § 16-50p (c) (1) and (3)[25] because the court concluded that they had briefed that claim inadequately. We conclude that the trial court acted properly.

The trial court—which in the present case was sitting in an appellate capacity—is not required to consider a claim that is inadequately briefed. See *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). Our review of the record before the trial court, reflecting the plaintiffs' written submissions on their claims, reveals that the trial court did not abuse its discretion in determining that the claim had been briefed inadequately.

We note, however, that the plaintiffs' claim, had it been reviewed, would have failed. Our independent review of the administrative record, in connection with the plaintiffs' other claims, reveals that the council's

---

[24] More specifically, Honan has not pointed to any benefit that he would obtain from litigating the claim under the UAPA. Indeed, it is likely that such an action would be barred under the principles of issue preclusion because Honan already has had a full and fair opportunity to litigate the issue of bias in the trial court. See *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 600–601, 922 A.2d 1073 (2007).

[25] Section 16-50p (c) (1) requires that for generation or storage facilities of nuclear materials; General Statutes § 16-50i (a) (3); the council must make a finding of public benefit for the proposed modification before issuing the certificate. Section 16-50p (c) (1) provides in relevant part: "The council shall not grant a certificate . . . either as proposed or modified by the council, unless it finds and determines a public benefit for the facility."

findings with regard to public need and benefit of the spent storage facility were supported by the record and that its decision in this respect was not arbitrary, capricious or illegal. There was evidence in the record before the council that the spent storage facility would be integral to the functioning of the plant, which is compromised of both operational units 2 and 3, and provides 28 percent of Connecticut's "installed capacity" and had provided 47 percent of the state's "actual generation needs between 2000 and 2002."[26] From this evidence the council reasonably concluded that a loss of power from units 2 and 3, which would occur earlier without the spent storage facility, "would impact the reliability of the electric market in the [s]tate and the region . . . ." As with any administrative appeal, our role is not to reexamine the evidence presented to the council or to substitute our judgment for the agency's expertise, but, rather, to determine whether there was substantial evidence to support its conclusions. *Wheelabrator Lisbon, Inc.* v. *Dept. of Public Utility Control*, supra, 283 Conn. 690–91. Therefore, in accordance with this highly deferential standard of review, the trial court, had it reached this claim, would have been required to affirm this aspect of the council's decision.

IV

Finally, we briefly address the fact that Honan and Burton raise a number of other claims of impropriety in this appeal. Specifically, Burton and Honan claim that the trial court had acted improperly when it: (1) declined to address the plaintiffs' claim that the council had not considered evidence of unreasonable pollution

---

[26] Although Honan and Burton's claim focuses on improper findings of the need for unit 2 alone, the council's findings of fact make it clear that the council considered the need for the spent storage facility with regard to both units, which it is permitted to do. See General Statutes § 16-50p (c) (1) and (3) (respectively, setting forth requirement of public benefit and providing definition of public benefit).

and prudent and feasible alternatives to the spent storage facility; (2) denied the plaintiffs' motion for a temporary restraining order;[27] (3) denied the plaintiffs' motion for an immediate remand and stay of the proceedings; (4) determined that the plaintiffs had not stated a claim under CEPA; and (5) declined to consider whether Ashton and Wilds should have disqualified themselves.[28] We decline to address the merits of these claims because the plaintiffs have briefed them inadequately.[29]

"We are not obligated to consider issues that are not adequately briefed." *West Haven* v. *Norback*, 263 Conn. 155, 177, 819 A.2d 235 (2003). "Whe[n] an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived." *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 115, 653 A.2d 782 (1995). In addition, mere conclusory assertions regarding a claim, with no mention of relevant authority and minimal or no citations from the record, will not suffice. See *Celentano* v. *Rocque*, 282 Conn. 645, 659, 923 A.2d 709 (2007); *Northeast Ct. Economic Alliance, Inc.* v. *ATC Partner-*

[27] We note that this claim would fail because the parties stipulated on the record in the trial court to declare the application for a restraining order moot because that claim concerned the same issues as the application for a stay.

[28] With respect to the claims that the trial court improperly concluded that the disqualification of Ashton and Wilds did not present an issue cognizable under CEPA and that the court declined to consider it, not only have Honan and Burton merely made cursory assertions with little to no substantive legal analysis, they also have overlooked the fact that the trial court considered, but rejected, that claim on the merits under CEPA. See part II of this opinion.

[29] In their reply brief, Honan and Burton raise the issue of "unreasonable pollution" in the context of an entirely new claim that the council and the trial court improperly interpreted § 16-50p (a) (3) (B) and therefore failed to consider the pollution generated by unit 2 of the plant cumulatively with the potential pollution of the spent storage facility. We do not address this new set of contentions, however, because, as we have stated, we do not address claims raised for the first time in a party's reply brief. *State* v. *Lopez*, 280 Conn. 779, 816 n.25, 823, 911 A.2d 1099 (2007).

*ship*, 272 Conn. 14, 44 n.20, 861 A.2d 473 (2004); *West Haven* v. *Norback*, supra, 177; see also Practice Book § 67-4.

The judgment is affirmed.

In this opinion the other justices concurred.