******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT EX REL. JEREMIAH
DUNN, CHIEF STATE ANIMAL CONTROL
OFFICER *v.* NANCY BURTON
(AC 45710)

Alvord, Elgo and Seeley, Js.

*Syllabus*

The defendant appealed from the judgment of the trial court vesting in the plaintiff ownership of numerous goats in the defendant's possession found to be neglected and cruelly treated and from the judgment of the court dismissing the defendant's counterclaim. The defendant claimed, inter alia, that the court improperly determined that she failed to comply with its order to relinquish ownership of the goats or pay a surety or cash bond by the deadline. *Held*:

The defendant's claim that the trial court lacked jurisdiction over the verified petition to vest temporary custody of the goats with the Department of Agriculture failed because the petition sufficiently detailed the defendant's neglect and cruel treatment of the goats so as to comply with the requirements of the governing statute ((Supp. 2022) § 22-329a (c)).

This court declined to review the defendant's inadequately briefed claims that the trial court improperly denied her motion to suppress certain evidence, that it did not decide her motion to relinquish the goats in a timely manner, that it improperly denied her motion to relinquish, that § 22-329a is unconstitutional on its face and as applied in the present case, and that the trial court improperly dismissed her counterclaim, in part, on the ground of sovereign immunity.

This court could not conclude that the defendant was denied due process when she was not allowed to present her motion to suppress certain evidence at the hearing regarding the temporary custody of the goats, as that hearing resulted in only an order of temporary custody of the goats and, had the defendant posted bond as required by § 22-329a (f), she could have presented her concerns about the evidence at a subsequent hearing.

This court declined to review the defendant's claim that she was entitled to notice and a hearing prior to the seizure of her goats pursuant to statute (§ 19a-341), the defendant having failed to identify where in the voluminous record the trial court's ruling on that claim could be found.

The trial court did not incorrectly conclude that temporary custody of the goats should vest with the department, the plaintiff having established that it was more probable than not that the goats were neglected or cruelly treated by the defendant.

The trial court's finding that the defendant did not relinquish ownership of the goats by the deadline ordered by the court was supported by the record and was not clearly erroneous.

The trial court did not improperly determine that the defendant failed to pay the bond ordered by the court pursuant to § 22-329a (c), as there was no dispute that she did not pay the required amount by the deadline.

The trial court did not abuse its discretion in dismissing, in part, the defendant's counterclaim on the basis of the prior pending action doctrine because the present action and a separate action brought by the defendant that was pending before the Superior Court were virtually alike.

Argued March 5—officially released November 26, 2024

*Procedural History*

Verified petition seeking, inter alia, custody in favor of the plaintiff of certain animals in the defendant's possession that allegedly were neglected or cruelly treated, and other relief, brought to the Superior Court in the judicial district of Hartford, where the court, *Cobb, J.*, issued an order vesting temporary custody of the animals with the plaintiff; thereafter, the case was transferred to the Superior Court in the judicial district of Waterbury, Complex Litigation Docket, where the court, *Bellis, J.*, denied the defendant's motion to suppress certain evidence and rendered judgment vesting permanent custody of the animals with the Department of Agriculture, from which the defendant appealed to this court; subsequently, the defendant filed a counterclaim; thereafter, the court, *Bellis, J.*, granted the plaintiff's motion to dismiss the counterclaim and rendered judgment thereon, and the defendant filed an amended appeal. *Affirmed.*

*Nancy Burton*, self-represented, the appellant (defendant).

*Matthew I. Levine*, deputy associate attorney general, with whom were *Daniel M. Salton*, assistant attorney general, and, on the brief, *William Tong*, attorney general, for the appellee (plaintiff).

*Opinion*

SEELEY, J. The self-represented defendant, Nancy Burton, appeals from the judgment of the trial court vesting permanent custody with the Commissioner of Agriculture, through the Department of Agriculture (department), of sixty-five goats owned by the defendant and from the judgment of the court dismissing the defendant's counterclaim against the plaintiff, the state of Connecticut. On appeal, the defendant raises a number of claims, which we distill to the following: (1) the court lacked jurisdiction over the verified petition filed by Jeremiah Dunn, the chief animal control officer of the plaintiff, to vest temporary custody of the goats with the department, (2) the court improperly denied her motion to suppress, which attacked the process by which the warrant to search her property and seize the goats was issued pursuant to General Statutes (Supp. 2022) § 22-329a (b),[1] (3) she was "denied due process when she was not allowed to present [her] motion to suppress for adjudication," (4) she was entitled to notice and a hearing prior to the seizure of her goats pursuant to General Statutes § 19a-341,[2] (5) the court improperly determined that the goats were subjected to neglect and cruel treatment, (6) the court improperly determined that the defendant failed to comply with its order to relinquish ownership of the goats by April 16, 2021, or pay a surety or cash bond in the amount of $32,000 by that date, (7) § 22-329a is unconstitutional on its face and as applied in this case, and (8) the court improperly dismissed the defendant's counterclaim on the ground that the claims raised in the counterclaim were barred by either sovereign immunity or the prior

---

[1] Hereinafter, unless otherwise indicated, all references to § 22-329a in this opinion are to the version of the statute set forth in the 2022 supplement to the General Statutes.

[2] Although § 19a-341 was amended in 2024; see Public Acts 2024, No. 24-70, § 1; that amendment has no bearing on the merits of this appeal. For simplicity, we refer to the current revision of the statute.

pending action doctrine. We affirm the judgments of the court.

The following facts, as set forth in the record or the trial court's memorandum of decision vesting temporary custody of the goats with the department, and procedural history are relevant to this appeal. At all relevant times, the defendant was the owner of real property located at 147 Cross Highway in Redding (property), on which she kept a herd of goats. The Redding Police Department (police department) had received at least 120 complaints regarding the goats kept on the property, most of which related to roaming goats and violations of town ordinances. In April, 2020, one of the goats was in the road and was struck by a motor vehicle.[3] The department, as well, received at least five complaints regarding the goats, most of which concerned their care and condition. On or about October 7, 2020, the state animal control unit received a complaint concerning injured and/or neglected goats kept on the property. Following that complaint, on October 15, 2020, Barbara Godejohn, a state animal control officer, along with Redding Police Detective Christina Dias, observed approximately fifty goats on the property, one of which appeared to be walking on its knees and unable to stand. Subsequently, Charles DellaRocco, a state animal control officer, was assigned to investigate a complaint made by the defendant and, on December 10, 2020, he went to the property. Although the defendant did not allow DellaRocco onto the property, DellaRocco was able to observe thirty-five to forty-five goats from a distance, one of which was visibly limping. On February 3, 2021, DellaRocco observed the goats from a nearby location, where he viewed the defendant as she provided a minimal amount

---

[3] As a result of the motor vehicle accident involving the goat, the defendant was arrested and charged with animal cruelty. That case is pending before the Superior Court.

of hay to a goat paddock containing ten goats. On the basis of DellaRocco's observations of the goats on February 3, 2021, the department decided to conduct further surveillance of the property for the purpose of determining the condition of the herd. That surveillance, which concluded on March 4, 2021, resulted in a number of animal health and property management concerns, including that the goats were not given enough food and fresh water, they were not provided with adequate shelters from the elements, the existing shelters were in disrepair, either missing walls or a roof, and the goats were living in unsanitary conditions as a result of manure piling up several feet high. The goats themselves appeared to be in poor condition as well, with some having overgrown hooves, which affected their gait and mobility.

As a result of these concerns, Dunn filed an application for a search and seizure warrant pursuant to § 22-329a (b) to seize the goats. The warrant application was accompanied by an affidavit from DellaRocco, who attested, on the basis of his observations, that the goats were being treated cruelly.[4] The court granted the application and issued the warrant on March 9, 2021, finding that there was probable cause that the goats were neglected or cruelly treated. The following day, the warrant was executed, and the department took custody of sixty-five live goats and one dead goat from the property. Furthermore, members of the department who were present during the execution of the warrant discovered between forty and fifty dead goats, in various stages of decomposition, in multiple locations throughout the property. Thereafter, Dunn filed a verified petition seeking, inter alia, temporary custody of the goats and requesting the court to issue an order to the defendant to show cause why the court should not

---

[4] Tanya Wescovich, a state animal control officer, was a coaffiant on the affidavit in support of the search warrant.

vest custody of the goats in the department.[5] The court granted that request, issued a show cause order to the defendant and ordered a remote hearing to be held on March 30, 2021. The court held an evidentiary hearing on the verified petition for temporary custody on March 30 and April 8, 2021. Thereafter, the court, *Cobb, J.,* granted the petition in part and ordered, inter alia, that "[t]emporary care and custody of the sixty-four live goats seized by the [plaintiff] . . . shall continue to be vested in the [plaintiff] . . . ."

In its memorandum of decision relating to the plaintiff's request seeking an order of temporary custody of the sixty-five goats seized from the property, the court made the following findings: "The defendant is the owner of the property located at 147 Cross Highway, Redding . . . and sixty-five live goats that lived on the property prior to March 10, 2021, when the animals were seized by the [plaintiff]. The defendant had owned other goats that died on the property. Forty to fifty goats were found dead and decaying on the property, with some of the carcasses found decaying in black plastic bags and Rubbermaid plastic bins. In October, 2020, the defendant voluntarily transferred twenty-three live goats from her property and placed them at an animal rescue facility.

"The defendant neglected the goats and treated them cruelly in a number of ways, including: (1) The defendant did not properly maintain the hooves of many of

---

[5] In the verified petition, Dunn also requested that (1) upon vesting temporary custody of the animals in the department, the court issue an order requiring the defendant either to relinquish ownership of the goats or post a surety or cash bond with the department, (2) the court make a finding that the goats were in imminent harm, neglected and/or cruelly treated in violation of General Statutes § 53-247, (3) the court vest permanent ownership and custody of the goats with the department, and (4) the court order the defendant to pay to the department the expenses incurred by the department to provide proper food, shelter and care to the goats, calculated at a rate of $15 per goat per day until ownership of the goats is vested in the plaintiff, as well as veterinary costs and expenses incurred.

the goats, allowing the hooves to grow too long which impacted their mobility.

"(2) The defendant did not maintain the property or the shelters in that she did not remove manure that accumulated on the property and inside the shelters. Certain of the shelters had manure piled up to a foot high. The buildup of the manure in the shelters limited the space available in the shelters for the goats and impeded the goats' ability to use them. The manure was also a hazard to the goats' health and safety.

"(3) Many of the goats seized by the [plaintiff] had manure caked into their fur and were missing significant areas of fur on their coats.

"(4) The defendant failed to provide the goats with adequate food or water. Many of the goats were underweight. Also, photographs depict many empty and dry food and water containers on the property. Certain of the buckets appeared to have had water in them but the water had frozen due to the freezing temperatures. When state investigators conducted a surveillance of the property over a two day period, one noted she did not see the defendant provide any food or water at any time.

"(5) When the defendant did provide water to the goats, she did not use a hose system, but rather purchased plastic gallon water bottles. The amount of water provided to the goats from these water bottles was insufficient. Also, the defendant then allowed empty plastic water bottles to be left around the property, where the goats had access and could chew on them.

"(6) The defendant did not provide the goats with proper or adequate shelter. The number of shelters located on the property [was] limited and sufficient to

accommodate only about thirty-five goats, not the sixty-five goats living on the property. In addition, the shelters were decrepit with missing walls and parts of ceilings. As a result, many of the shelters failed to provide proper protection for the animals from the rain, snow, cold, wind and other inclement weather.

"(7) The defendant allowed the property to be riddled with numerous dead and decaying goats.

"(8) The defendant allowed at least one goat to die on the property without proper care or treatment nor did she provide the goat with a proper or humane death. On March 10, the [plaintiff] found a recently deceased goat lying on the floor of a shelter used by the live goats. There was evidence that the deceased goat had fallen and could not get up and had been scraping his legs against the floor of the shelter prior to its death. Parts of that dead goat's body had been eaten by rodents or other vermin.

"Since the goats were seized by the [plaintiff] on March 10, 2021, and have been in the [department's] custody, one goat has died and six kids have been born, putting the number of goats in the [department's] care at seventy. When the six kids were born, their birthweights were unusually low, and all needed human intervention to survive.

"The court finds that while in the defendant's care, the sixty-five goats were in imminent harm and were neglected and cruelly treated by the defendant. The court, therefore, determines that the [plaintiff] has met its burden to establish reasonable cause to find that the animals' condition and the circumstances surrounding their care by the defendant require that temporary care and custody continue to be assumed by the [plaintiff] to safeguard the goats' welfare."

The court, therefore, vested temporary care and custody of the sixty-four live goats seized and the newly

born kids in the department. The court also ordered that the defendant, "[o]n or before April 16, 2021 . . . relinquish ownership of the animals to the [plaintiff] or post a surety or cash bond with the [department] in the amount of [$500] per each of the sixty-four remaining live goats seized by the [plaintiff] to pay for the reasonable expenses in caring and providing for such animals . . . ." The court further ordered the defendant to "pay the expenses incurred by the [department] in providing proper food, shelter and care to each animal calculated at the rate of [$15] per goat per day beginning March 11, 2021, and continuing until the goats are returned to the defendant, the defendant relinquishes custody of the goats or permanent custody of the goats is vested in the [department] . . . [and] . . . pay all veterinary costs and expenses incurred for the welfare of the animals, which costs are not covered in the per diem rate during the period the goats remain in the [department's] temporary care and possession."

On April 20, 2021, the plaintiff filed a motion for an order requesting that the court vest permanent custody of the goats in the department. The basis for the motion was the defendant's failure to post a bond or to voluntarily relinquish ownership of the goats, as ordered by the court on April 9, 2021, and as required by § 22-329a (f).[6] In its motion, the plaintiff asserted: "Pursuant to

---

[6] General Statutes (Supp. 2022) § 22-329a (f) provides: "If the court issues an order vesting the animal's temporary care and custody in some suitable state, municipal or other public or private agency or person, the owner or owners shall either relinquish ownership of the animal or post a surety bond or cash bond with the agency or person in whom the animal's temporary care and custody was vested. The surety bond or cash bond shall be in the amount of five hundred dollars for each animal placed in the temporary care or custody of such agency or person and shall secure payment for the reasonable expenses of the agency or person having temporary care and custody of the animal in caring and providing for such animal until the court makes a finding as to the animal's disposition under subsection (g) of this section. The requirement that a bond be posted may be waived if such owner provides satisfactory evidence that such owner is indigent and unable to pay for such bond."

the order of the court, the defendant was given a choice of posting a bond, in order to protect the plaintiff from the increasing expense of caring for her goats during the pendency of these proceedings, or relinquishing ownership over them. The order unambiguously required the defendant to choose. The court required the defendant to post a surety or cash bond in the amount of $32,000 ($500 per animal). The defendant has refused to comply with the order of the court. Instead, the defendant sent a check to the plaintiff in the amount of $450 and has attempted to unilaterally modify the order to her benefit. Notably, the defendant's attempt to ignore the order is based, in part, on her desire to proceed only to oppose the [plaintiff's] efforts to obtain ownership over nine specifically identified goats. By any metric, the defendant has wilfully defied the order of the court by failing to post the bond as required by the court or [to] relinquish ownership over the goats. As a result of the defendant's refusal to comply with the court's order, ownership must be vested in the [department]." The defendant filed an objection to the plaintiff's motion for an order on April 27, 2022.

On May 4, 2022, the court granted the plaintiff's motion for an order. In its written order, the court, *Bellis, J.*, stated: "The clear and unambiguous order of the court . . . on April 9, 2021, required the defendant to either relinquish control of the goats to the [plaintiff] or post surety or cash bond with the [department] in the amount of [$500] for each of the sixty-four remaining live goats no later than April 16, 2021. While the defendant filed a motion to 'Relinquish Ownership of Goats for Immediate Release to Qualified Animal Rescue Sanctuaries' on the April 16, 2021 deadline, that motion, which was subsequently denied, was an offer to relinquish ownership of the goats to two animal sanctuaries and various private individuals of the defendant's own choosing. Simply put, it was *not* an offer to relinquish

control of the goats to the [plaintiff]. As such, the defendant did not relinquish control of the goats to the [plaintiff] by the April 16, 2021 court deadline. Therefore, the sole issue for the court is whether the defendant posted surety or cash bond with the [department] in the amount of [$500] for each of the sixty-four remaining live goats. The total amount due, on or before April 16, 2021, pursuant to the court's order, was $32,000. The defendant makes no claim that the $32,000 was paid. The court rejects the defendant's argument that the [plaintiff] waived the $32,000 based on her claim that the [plaintiff] had done so in the past in other matters. There is neither argument nor evidence in this case that the [plaintiff] has waived the surety or cash bond, but, more importantly, the imposition of the surety or cash bond was a binding order of the court [that] the parties were required to comply with. For these reasons, the motion of the [plaintiff] is granted. Permanent ownership of all of the defendant's goats and their offspring, born and unborn, is vested in the [department]. Additionally, pursuant to . . . § 22-329a (h), the sum of $39,360 ($15/ day for forty-one days of care for sixty-four goats) plus any veterinary costs not covered by the per diem rate associated with the care of the goats for that forty-one day time period shall be paid by the defendant to the [department]." (Emphasis in original.)

Subsequently, the plaintiff filed a motion for judgment in accordance with the court's May 4, 2022 order. On June 22, 2022, the court, *Bellis*, *J.*, granted the motion and rendered judgment for the plaintiff with respect to its action against the defendant but noted that a counterclaim filed by the defendant remained pending. The defendant appealed to this court from the June 22, 2022 judgment in favor of the plaintiff. Thereafter, the court, *Bellis*, *J.*, granted a motion to dismiss the counterclaim filed by the plaintiff following argument on the motion, and the defendant filed an

amended appeal with this court challenging the judgment dismissing her counterclaim. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that the court lacked jurisdiction over the verified petition to vest temporary custody of the goats with the department. The defendant bases this claim on her assertion that, because the verified petition fails to identify the goats individually and to "plainly state" facts pertaining to the neglect and cruel treatment with regard to each goat seized, the goats were never brought within the jurisdiction of the court as a result of this alleged deficiency in the verified petition. Thus, according to the defendant, the court lacked jurisdiction over this case pursuant to the governing statute, § 22-329a (c). The plaintiff, on the other hand, counters that this claim, which concerns the sufficiency of the verified petition, does not implicate the subject matter jurisdiction of the court. We conclude that, even if we assume, without deciding, that the claim implicates the court's jurisdiction over the matter, the claim nonetheless fails, as the verified complaint sufficiently complied with the requirements of the statute.

We first set forth our standard of review for this claim. The defendant's claim "presents a question of statutory construction over which we exercise plenary review. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other

statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. General Statutes § 1-2z. . . . [A] statute is plain and unambiguous when the meaning . . . is so strongly indicated or suggested by the [statutory] language . . . that . . . it appears to be *the* meaning and appears to preclude any other likely meaning. . . . [I]f the text of the statute at issue . . . would permit more than one likely or plausible meaning, its meaning cannot be said to be plain and unambiguous." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Demarco* v. *Charter Oak Temple Restoration Assn., Inc.*, 226 Conn. App. 335, 339–40, 317 A.3d 1137, cert. denied, 349 Conn. 923, 321 A.3d 1130 (2024). "It is a basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation." (Internal quotation marks omitted.) *Townsend* v. *Commissioner of Correction*, 226 Conn. App. 313, 331, 317 A.3d 1147 (2024). Applying these principles to § 22-329a (c), and for the reasons that follow, we conclude that the defendant's interpretation of § 22-329a (c) is not consistent with the plain language of the statute.

Section 22-329a (c) applies after the department has taken custody of animals and provides in relevant part that an animal control officer "shall file with the [S]uperior [C]ourt . . . a verified petition plainly stating such facts of neglect or cruel treatment as to bring *such animal* within the jurisdiction of the court . . . . ." (Emphasis added.) The defendant argues that we should construe "such animal" as used in the statute as meaning each individual animal. She does so, however,

without citation to any authority supporting that interpretation.[7] "Courts are not permitted to read words into the statute that the legislature did not insert." *Dusto* v. *Rogers Corp.*, 222 Conn. App. 71, 108, 304 A.3d 446 (2023), cert. denied, 348 Conn. 939, 307 A.3d 274 (2024); see also *Randolph* v. *Mambrino*, 216 Conn. App. 126, 143, 284 A.3d 645 (2022) (" '[w]e will not read into a [statute] words or limitations that are not there' "). We, therefore, decline to read into the statute words that are not stated therein.

Furthermore, as we have stated, the statute must be read as a whole. Subsection (b) of § 22-329a permits any animal control officer to take physical custody of "*any animal* upon issuance of a warrant finding probable cause that *such animal* is neglected or is cruelly treated . . . ." (Emphasis added.) "[S]uch animal" under the statute thus means any animal over which the animal control officer, i.e., the department, takes custody, which could range from one to many animals. In the present case, custody was taken over sixty-five

---

[7] In her appellate briefs, the defendant cites only to other Superior Court animal welfare cases in which the verified petitions addressed specific animals in support of her claim that each of the sixty-five goats had to be referenced individually in the verified petition in the present case. See *State ex rel. Dunn* v. *Kornstein*, Superior Court, judicial district of Hartford, Docket No. CV-20-6124017-S (February 20, 2020) (seizure of 1 cow, 137 chickens, 33 ducks, 6 dogs, and 18 cattle); *State ex rel. Connors* v. *Olajos*, Superior Court, judicial district of Hartford, Docket No. CV-16-6065975-S (March 8, 2016) (seizure of 32 horses, 78 chickens, 19 rabbits and 2 dogs); *State ex rel. Dunn* v. *Wilson*, Superior Court, judicial district of Hartford, Docket No. CV-21-6137026-S (February 4, 2021) (seizure of eight horses). These cases, in addition to being nonbinding authority, do not provide support for that proposition. Although the verified petition in each case made specific references to some of the animals seized, each petition did not do so with respect to the remainder of the seized animals and, instead, referred to them generally or as a whole by category of animal. These cases, thus, do not support a conclusion that the plaintiff is obligated under the statute to identify each animal that is part of the seizure and make specific factual allegations regarding each animal individually, and the defendant has not provided any other authority demonstrating otherwise.

goats. It logically follows that the requirement in subsection (c) of a plain statement of facts of neglect and cruel treatment in the verified petition must be made as to the animals—the sixty-five goats—over which the department took custody. In the present case, the verified petition set forth in great detail the observations of various animal control officers during the course of the surveillance operation that took place prior to the seizure of the goats. Those observations revealed health concerns related to the goats, as well as property management concerns, including that ten to twelve "goats had extremely long hooves that affected their mobility," one of the goats appeared to be limping and unable to stand, the animals had to take shelter in manure filled enclosures because manure was allowed to accumulate in and around the paddocks, "the animals [did] not have adequate access to fresh water," and "the shelter provided in the paddocks did not provide enough space to shelter all of the animals and the shelters did not provide an adequate wind break for high winds and cold weather." The verified petition further outlined the conditions of the goats and the property following the seizure. For example, it explained that, "[d]uring the execution of the warrant, dozens of dead goats, estimated to be between forty . . . and fifty . . . were discovered in multiple locations on the property in various stages of decomposition" and that dead goats were found in plastic bags, inside trash containers, and in a shallow pit that was covered by plywood. Of the sixty-five goats that were seized, the verified petition alleged that a number of them were visibly underweight, had fur that was missing, matted, or caked in mud and manure, and had "extremely long hooves that were not being maintained and were affecting the mobility of the animals."

We conclude that the facts alleged in the verified petition sufficiently detailed the neglect and cruel treatment of the goats so as to comply with the terms of

§ 22-329a (c). The clear and unambiguous language of the statute requires the animal control officer to include in the verified petition a plain statement of the facts demonstrating neglect and cruel treatment of "such animal" over which custody has been taken. In the present case, sixty-five goats were seized from the property. The verified petition sets forth a plain statement of the facts pertaining to the neglect and cruel treatment of the herd of goats that resided on the property. There is no language in the statute requiring that the plain statement of facts of neglect and cruel treatment single out "each" individual animal seized, as argued by the defendant. Moreover, the allegations of cruel treatment pertaining to the goats stemmed in large part from the defendant's management of the property. As we have stated, the verified petition alleged that the defendant failed to provide adequate shelter for the goats, failed to give them sufficient access to fresh water, and allowed the goats to live in manure filled shelters and with dead goats in various stages of decomposition strewn about the property. All of the goats on the property were being subjected to these unsanitary conditions. It, thus, would be nonsensical for the statute to require that the verified petition assert a separate allegation as to each individual goat when, as here, the allegations contained therein plainly stated the cruel treatment to which the goats, as a herd, were being subjected. "[A] court must construe a statute as written. . . . Courts may not by construction supply omissions . . . or add exceptions merely because it appears that good reasons exist for adding them. . . . The intent of the legislature, as this court has repeatedly observed, is to be found not in what the legislature meant to say, but in the meaning of what it did say. . . . It is axiomatic that the court itself cannot rewrite a statute to accomplish a particular result. That is a function of the legislature." (Internal quotation marks omitted.) *State*

v. *Richard P.*, 179 Conn. App. 676, 688, 181 A.3d 107, cert. denied, 328 Conn. 924, 181 A. 3d 567 (2018). The defendant's claim, therefore, is unavailing.

## II

The defendant next challenges the court's denial of her April 8, 2021 motion to suppress,[8] which attacked the process by which the warrant to search her property and seize the goats was issued pursuant to § 22-329a (b). In her motion, the defendant alleged that the warrant was "procured under false pretenses" by Della-Rocco, that his affirmations under oath to procure the warrant were "highly suspect," and that his affidavit was "replete with false, fanciful and ridiculous" assertions that were made recklessly and that did not establish probable cause. The defendant sought a new probable cause hearing, the warrant "stricken," and the goats returned. On appeal, the defendant reiterates her assertions that DellaRocco lacked credibility and that the warrant failed to establish probable cause. She now argues for the first time that (1) DellaRocco lacked credibility because he wilfully withheld facts, namely, that he failed to disclose a prior arrest on felony charges of larceny and forgery, and that such facts, if known, "would have doomed the [warrant] application"; and (2) the trial judge who made the finding of probable cause to issue the warrant had a conflict of interest. Because these arguments were not raised in the defendant's motion to suppress[9] and are being raised for the

[8] In an order dated April 13, 2022, the court, *Bellis*, *J.*, denied the motion summarily.

[9] On appeal, the plaintiff argues that the defendant "does not have a fourth amendment right to suppress evidence in civil proceedings like animal welfare actions." As the plaintiff maintains, "[o]ur jurisprudence has long held that one cannot exclude evidence based on an alleged fourth amendment violation in civil cases." Although this court recently determined that the exclusionary rule does not apply in the context of a civil animal welfare action involving a warrantless search; see *State ex rel. Dunn* v. *Connelly*, 228 Conn. App. 458, 459–60,     A.3d     (2024); the present case, in contrast, involves a claim that the affidavit in support of the search warrant contained assertions that were known to be false and omitted material facts, thereby

first time on appeal, we decline to review them.[10] See *Deutsche Bank Trust Co. Americas* v. *Burke*, 218 Conn. App. 542, 546 n.4, 292 A.3d 81 (declining to review claim raised for first time on appeal), cert. denied, 347 Conn. 904, 297 A.3d 567 (2023). Moreover, with respect to her claim that DellaRocco's allegations in his affidavit in support of the warrant lacked credibility and did not establish probable cause, the defendant makes conclusory assertions without any citation to authority or analysis of the law as applied to this case. "Where the parties cite no law and provide no analysis of their claims, we do not review such claims." (Internal quotation marks omitted.) *Jalbert* v. *Mulligan*, 153 Conn. App. 124, 133, 101 A.3d 279, cert. denied, 315 Conn. 901, 104 A.3d 107

implicating *Franks* v. *Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). See footnote 10 of this opinion. We need not decide whether the exclusionary rule applies in such circumstances in light of the defendant's failure to adequately brief her claim regarding her motion to suppress.

[10] We note that, in her motion to suppress, the defendant cited to *Franks* v. *Delaware*, 438 U.S. 154, 155–56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), in support of her claim that the warrant affidavit was premised on false statements and omitted material facts. "In *Franks* v. *Delaware*, supra, [438 U.S.] 155–56, the United States Supreme Court held that where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, *and* if the allegedly false statement is necessary to the finding of probable cause, the [f]ourth [a]mendment requires that a hearing be held at the defendant's request. . . . The court in *Franks* mentioned only a false statement . . . included . . . in the warrant affidavit; subsequent cases, however, have extended *Franks* to include material omissions from such an affidavit." (Emphasis in original; internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 519–20, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008). On appeal, the defendant has neither cited to *Franks* nor argued in her appellate briefs that she was entitled to a *Franks* hearing. We, therefore, deem any such claim abandoned. See *Samelko* v. *Kingstone Ins. Co.*, 329 Conn. 249, 255 n.3, 184 A.3d 741 (2018) (claim raised at trial but not argued on appeal was deemed abandoned); see also *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 306 Conn. 304, 319, 50 A.3d 841 (2012) ("[a]n appellant who fails to brief a claim abandons it" (emphasis omitted; internal quotation marks omitted)), cert. denied, 569 U.S. 918, 133 S. Ct. 1809, 185 L. Ed. 2d 812 (2013).

(2014). "We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Prescott* v. *Gilshteyn*, 227 Conn. App. 553, 571 n.8, 322 A.3d 1060 (2024). Because the defendant has inadequately briefed her challenge to the denial of her motion to suppress, we decline to review this claim.[11]

---

[11] We are mindful that "[i]t is the established policy of the Connecticut courts to be solicitous of [self-represented] litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the [self-represented] party. . . . Nonetheless, [a]lthough we allow [self-represented] litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law." (Internal quotation marks omitted.) *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 803–804, 256 A.3d 655 (2021); see also *Wells Fargo Bank, N.A.* v. *Caldrello*, 192 Conn. App. 1, 34, 219 A.3d 858 (" '[a]lthough we are solicitous of the rights of pro se litigants . . . [s]uch a litigant is bound by the same rules . . . and procedure as those qualified to practice law' "), cert. denied, 334 Conn. 905, 220 A.3d 37 (2019). "[A]lthough we recognize and adhere to the well-founded policy to accord leeway to self-represented parties in the appeal process, our deference is not unlimited; nor is a litigant on appeal relieved of the obligation to sufficiently articulate a claim so that it is recognizable to a reviewing court." (Internal quotation marks omitted.) *L. K.* v. *K. K.*, 226 Conn. App. 279, 303 n.11, 318 A.3d 243 (2024); see also *Burton* v. *Dept. of Environmental Protection*, supra, 804; *Bank of New York Mellon* v. *Horsey*, 227 Conn. App. 94, 107 n.9, 321 A.3d 441 (2024). Moreover, although the defendant is a self-represented party, she was a licensed attorney prior to being disbarred in 2008; see https://www.jud.ct.gov/attorneyfirminquiry/JurisDetail.aspx (last visited November 15, 2024); and, therefore, has legal training that most self-represented litigants do not have. See *Nationstar Mortgage, LLC* v. *Giacomi*, 226 Conn. App. 467, 480 n.8, 319 A.3d 794 (2024); see also *United States* v. *Pierce*, 649 Fed. Appx. 117, 117 n.1 (2d Cir. 2016) ("[The defendant] was a licensed attorney before he was automatically disbarred as a result of his conviction in this case. . . . While [i]t is well established that a court is ordinarily obligated to afford a special solicitude to [self-represented] litigants, it is also well established that a lawyer representing himself [or herself] ordinarily receives no such solicitude at all. . . . Because the rationale for this latter rule is that an attorney is experienced in litigation and familiar with the procedural setting presented . . . it extends to disbarred attorneys . . . ." (Citations omitted; internal quotation

III

The defendant next claims that she was "denied due process when she was not allowed to present [her] motion to suppress for adjudication." We disagree.

The following additional facts and procedural history are relevant to this claim. At the end of the day of the hearing on March 30, 2021, concerning the plaintiff's verified petition, the plaintiff's counsel requested that the court issue an order for temporary custody, which he argued would trigger subsection (f) of § 22-329a and allow for the remainder of the hearing to address a permanent order for custody of the goats. The court declined to issue any order at that time. On April 8,

marks omitted.)), cert. denied, 580 U.S. 1104, 137 S. Ct. 841, 197 L. Ed. 2d 78 (2017); *Tracy* v. *Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) (explaining that "the degree of solicitude" afforded to self-represented litigants is not identical and "may be lessened where the particular [self-represented] litigant is experienced in litigation and familiar with the procedural setting presented"). The defendant also has represented herself in numerous appeals before this court and our Supreme Court. See *Burton* v. *Dept. of Environmental Protection*, supra, 337 Conn. 781; *Burton* v. *Commissioner of Environmental Protection*, 323 Conn. 668, 150 A.3d 666 (2016); *Burton* v. *Dominion Nuclear Connecticut, Inc.*, 300 Conn. 542, 23 A.3d 1176 (2011); *Statewide Grievance Committee* v. *Burton*, 299 Conn. 405, 10 A.3d 507 (2011); *Burton* v. *Commissioner of Environmental Protection*, 291 Conn. 789, 970 A.2d 640 (2009); *Connecticut Coalition Against Millstone* v. *Connecticut Siting Council*, 286 Conn. 57, 942 A.2d 345 (2008); *Statewide Grievance Committee* v. *Burton*, 282 Conn. 1, 917 A.2d 966 (2007); *Jackson* v. *Drury*, 191 Conn. App. 587, 216 A.3d 768, cert. denied, 333 Conn. 938, 218 A.3d 1050 (2019); *Burton* v. *Freedom of Information Commission*, 161 Conn. App. 654, 129 A.3d 721 (2015), cert. denied, 321 Conn. 901, 136 A.3d 642 (2016); *Burton* v. *Connecticut Siting Council*, 161 Conn. App. 329, 127 A.3d 1066 (2015), cert. denied, 320 Conn. 925, 133 A.3d 459 (2016); *Burton* v. *Dominion Nuclear Connecticut, Inc.*, 129 Conn. App. 203, 21 A.3d 824, cert. denied, 302 Conn. 929, 28 A.3d 342 (2011); *Statewide Grievance Committee* v. *Burton*, 88 Conn. App. 523, 871 A.2d 380 (2005), aff'd, 282 Conn. 1, 917 A.2d 966 (2007); *Honan* v. *Dimyan*, 85 Conn. App. 66, 856 A.2d 463 (2004). As a result, she is more experienced in litigation than most self-represented parties and is well versed with the rules of appellate procedure. See *Turner* v. *Commissioner of Correction*, 201 Conn. App. 196, 224, 242 A.3d 512 (2020), cert. denied, 336 Conn. 945, 250 A.3d 694 (2021).

2021, at the outset of the second day of the hearing, the court referred to the conversation from the previous day concerning the issue of whether the hearing should be for a permanent or temporary order. The court stated that it believed that the statute called for a two step process, that is, the court first had to determine whether a temporary order of custody was necessary and then, if necessary, it could address permanency at a separate proceeding. Both counsel for the plaintiff and the defendant initially agreed with the court proceeding that way and focusing the hearing on whether an order of temporary custody was warranted. Thereafter, the defendant notified the court that she had filed a motion to suppress and requested that her motion take priority over the proceedings that day, as she believed that "it should be considered first before anything else happen[ed] further in th[e] case." The court responded by stating that the proceedings that day would be moving forward and indicated that it would not be addressing the defendant's motion to suppress at the hearing that day, after which the defendant objected to the way in which the court was proceeding with the hearing, arguing that her due process rights required the court to consider her motion to suppress before continuing with the hearing. The court, nonetheless, overruled her objection to moving forward on the issue of a temporary order and stated: "With respect to your motion to suppress, this is a civil proceeding, it's not a criminal proceeding. Your motion will be taken up in due course, but not right now. This is a *temporary* proceeding, as I said before." (Emphasis added.)

The defendant asserts in her appellate brief that "[t]he motion was later marked 'off' . . . sua sponte by [*Hon. Jane S. Scholl*, judge trial referee], who had virtually no other involvement in the case. The motion was eventually denied without notice or a hearing by Judge Bellis on April 13, 2022 . . . a full year later. The defendant's

supplement to motion to suppress . . . and motion in limine were also summarily disposed of by denial. Thereby, *the defendant was denied the opportunity to pursue her challenge to the warrant,* which, if successful, would have led to immediate release of all the goats and termination of this case and threats of excessive monetary penalties. The court's refusal to allow the defendant a hearing on the motion to suppress and related motions was a clear denial of due process." (Emphasis added.)

We next set forth general principles governing due process claims. "Whether a party was deprived of his [or her] due process rights is a question of law to which appellate courts grant plenary review. . . . The core interests protected by procedural due process concern the opportunity to be heard at a meaningful time and in a meaningful manner. . . . Fundamental tenets of due process require that all persons directly concerned in the result of an adjudication be given reasonable notice and opportunity to present their claims or defenses. . . . Due process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . Instead, due process is a flexible principle that calls for such procedural protections as the particular situation demands." (Citations omitted; internal quotation marks omitted.) *Cameron* v. *Santiago*, 223 Conn. App. 836, 842–43, 310 A.3d 391 (2024). "Due process does not mandate full evidentiary hearings on all matters, and not all situations calling for procedural safeguards call for the same kind of procedure. . . . So long as the procedure afforded adequately protects the individual interests at stake, there is no reason to impose substantially greater burdens . . . under the guise of due process." (Internal quotation marks omitted.) *In re Sarah S.*, 110 Conn. App. 576, 589 n.7, 955 A.2d 657 (2008).

Our Supreme Court has explained that "[t]he extent to which procedural due process must be afforded the recipient is influenced by the extent to which he [or she] may be condemned to suffer grievous loss. . . . Whether the loss threatened by a particular type of proceeding is sufficiently grave to warrant more than average certainty on the part of the factfinder turns on both the nature of the private interest threatened and the permanency of the threatened loss." (Internal quotation marks omitted.) *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 297, 455 A.2d 1313 (1983).

Under the statutory scheme of § 22-329a, if an animal has been seized pursuant to a warrant finding probable cause that such animal is neglected or is cruelly treated under subsection (b), an animal control officer must file a verified petition plainly stating the facts of neglect or cruel treatment. See General Statutes (Supp. 2022) § 22-329a (b) and (c). Pursuant to subsection (d) of § 22-329a, "[i]f physical custody of an animal has been taken pursuant to subsection . . . (b) . . . and it appears from the allegations of the petition filed pursuant to subsection (c) of this section and other affirmations of fact accompanying the petition, or provided subsequent thereto, that there is reasonable cause to find that the animal's condition or the circumstances surrounding its care require that temporary care and custody be immediately assumed to safeguard its welfare, the court shall either (1) issue an order to show cause why the court should not vest in some suitable state, municipal or other public or private agency or person the animal's temporary care and custody pending a hearing on the petition, or (2) issue an order vesting in some suitable state, municipal or other public or private agency or person the animal's temporary care and custody pending a hearing on the petition. A hearing on the order issued by the court pursuant to subdivision (1) or (2) of this subsection [(show cause order)] shall

be held not later than fourteen days after the issuance of such order." If, following a hearing on the show cause order, a court vests temporary "care and custody" of the animal "in some suitable state, municipal or other public or private agency or person," the owner "shall either relinquish ownership of the animal or post a surety bond or cash bond" to pay for the reasonable expenses of the agency having temporary care of the animal until there is a final disposition pursuant to subsection (g). General Statutes (Supp. 2022) § 22-329a (f).

Following an order of temporary custody, § 22-329a (g) (1) requires that a hearing must be held at which it must be demonstrated that the animal, in fact, is or is not being neglected or cruelly treated.[12] Subsection (g) of § 22-329a provides in relevant part: "If, after hearing, the court finds that the animal is neglected or cruelly treated, it shall vest [permanent] ownership of the animal" with the department or "any state, municipal or other public or private agency . . . or . . . person," but if the court finds that the animal is not neglected or cruelly treated, it may return the animal to its owner. General Statutes (Supp. 2022) § 22-329a (g) (1) and (3). At this hearing, the animal owner has an opportunity to contest the seizure, which necessarily includes challenging the validity of the warrant. Thus, under the statute, the deprivation of an animal owner's right in a temporary custody adjudication is neither final nor irrevocable; such order must be followed by a hearing to determine permanent ownership of the animal, including consideration of whether such animal must be returned to the owner. See *Cookson* v. *Cookson*, 201 Conn. 229, 235, 514 A.2d 323 (1986) ("the deprivation of rights in a *temporary* custody adjudication is

---

[12] We note that there is nothing in the statute that prevents parties from agreeing to hold a hearing in one step, as long as the hearing is held within fourteen days of the show cause order.

neither final nor irrevocable" (emphasis added; internal quotation marks omitted)).

In the present case, the court made it clear to the parties that it would be addressing the verified petition in a two step process: first, it would determine, following the March 30 and April 8 hearings, whether an order of temporary custody of the goats was necessary. If it did so and issued such an order, and if the defendant subsequently paid the bond set by the statute and did not relinquish ownership of her goats, then a second hearing would be held to address permanent custody of the goats. Thus, when the defendant raised the issue of her motion to suppress and the court told her it would not be addressed at that temporary proceeding but that it would be "taken up in due course," the court was indicating that it was not appropriate to address the motion at that time, but that it would be addressed at a future hearing. Pursuant to § 22-329a (g) (1), there would have been a hearing on permanent custody, provided the defendant paid the bond as set forth in the court's order and the statute. In the present case, however, the defendant did not post the bond and, consequently, a subsequent hearing on permanent custody, at which she could have raised her challenge to the validity of the search warrant, never took place. On the basis of this record, we cannot conclude that the defendant was denied due process. In light of the fact that the hearing on April 8, 2021, resulted in an order of temporary custody of the goats, the defendant was not denied due process as a result of the court's failure to consider her motion to suppress at that hearing.[13] As

---

[13] In *State* v. *Kane*, 218 Conn. 151, 588 A.2d 179 (1991), the Supreme Court addressed a similar issue in the context of a probable cause hearing. Pursuant to General Statutes § 54-46a, a defendant charged with any crime punishable by death, life imprisonment without the possibility of release or life imprisonment is entitled to a probable cause hearing. In *Kane*, the defendant argued on appeal that he was denied due process because the statute governing probable cause hearings precluded him from having a hearing on his motion to suppress at the probable cause stage of the proceedings. See id., 155.

the court stated, the motion would be "taken up in due course." The fact that the motion was never ultimately "taken up" is due to the defendant's failure to post the bond as required by the statute and ordered by the court, which obviated the need for a permanent custody hearing. See part VI B of this opinion. The defendant's concerns about the validity of the warrant could have been raised at a meaningful time and in a meaningful manner had she posted a bond for the goats following the order vesting their temporary custody in the department. The defendant's claim that she was denied due process, therefore, fails.

## IV

The defendant's next claim is that she was entitled to notice and a hearing prior to the seizure of her goats pursuant to § 19a-341.[14] Specifically, the defendant

In rejecting the defendant's claim, the Supreme Court explained that "[a] preliminary hearing is not designed to be a dress rehearsal for the trial. . . . [A]s long as the defendant was afforded the opportunity to challenge the admissibility of his statements at trial, the adjudicatory phase of the proceeding against him, his right to due process was preserved." (Citations omitted; internal quotation marks omitted.) Id., 159.

[14] General Statutes § 19a-341 is titled, "Agricultural or farming operation not deemed a nuisance; exceptions. Spring or well water collection operation not deemed a nuisance," is located in the chapter of the General Statutes titled, "Public Health and Well-being," and provides in relevant part: "(a) Notwithstanding the provisions of any general statute or municipal ordinance or regulation pertaining to nuisances to the contrary, no agricultural or farming operation, place, establishment or facility, or any of its appurtenances, or the operation thereof, shall be deemed to constitute a nuisance, either public or private, due to alleged objectionable (1) odor from livestock, manure, fertilizer or feed, (2) noise from livestock or farm equipment used in normal, generally acceptable farming procedures, (3) dust created during plowing or cultivation operations, (4) use of chemicals, provided such chemicals and the method of their application conform to practices approved by the Commissioner of Energy and Environmental Protection or, where applicable, the Commissioner of Public Health, or (5) water pollution from livestock or crop production activities, except the pollution of public or private drinking water supplies, provided such activities conform to acceptable management practices for pollution control approved by the Commissioner of Energy and Environmental Protection; provided such agricultural or farming operation, place, establishment or facility has been in operation

asserts that an investigation of her property and the goats was conducted in 2017 and 2018 pursuant to § 19a-341, which resulted in a finding that the goats "appear[ed] to be in good condition with food and water available." That finding is set forth in a 2018 investigation report by the department that was admitted as a full exhibit at the March 30, 2021 hearing. On appeal, the defendant relies on that report as "prima facie evidence that [her] goat operation conforms with generally accepted agricultural practices pursuant to § 19a-341 . . . ." She also argues that the plaintiff was thus required to "overcome such prima facie evidence at a hearing preceded by notice before it could lawfully proceed with the 2021 seizure . . . ." We decline to review this claim.

First, the defendant does not include any citations in her appellate brief to the record showing when she raised this claim before the court or when it was addressed or decided by the court. Indeed, the report itself, on which the defendant relies in making this claim, makes no reference to § 19a-341. Instead, the report was generated in connection with a complaint of animal cruelty filed against the defendant pursuant to General Statutes § 53-247 (a), and it simply concludes that, at the end of the investigation that occurred in *2017* and *2018*, "all goats on the property appear[ed] to be in good condition with food and water available," without mentioning any compliance with § 19a-341. Moreover, at the March 30, 2021 hearing, when the defendant offered the report into evidence, she made no reference to § 19a-341 or to her claim that it entitled her to a hearing prior to the seizure of her goats; instead,

for one year or more and has not been substantially changed, and such operation follows generally accepted agricultural practices. *Inspection and approval of the agricultural or farming operation, place, establishment or facility by the Commissioner of Agriculture or the commissioner's designee shall be prima facie evidence that such operation follows generally accepted agricultural practices* . . . ." (Emphasis added.)

she questioned DellaRocco about the investigation of the complaint of animal cruelty that formed the basis of the report. Also, on the basis of our review of the record up to and through the temporary custody hearing held on March 30 and April 8, 2021, we could not find any motion filed by the defendant claiming that she was entitled to notice and a hearing under § 19a-341 prior to the seizure of her animals in early March, 2021.

As our Supreme Court recently has stated, it is the responsibility of parties, not an appellate court, "to clearly identify how and where in the record the claim that the party is raising on appeal was preserved for review and *where in the record the trial court's ruling on the claim may be found . . . .*" (Emphasis added.) *Dur-A-Flex, Inc.* v. *Dy*, 349 Conn. 513, 589–90, 321 A.3d 295 (2024). That is especially true in a case such as the present one, in which the pleadings are voluminous. We, therefore, decline to review this claim.

V

The defendant next challenges the court's determination that the plaintiff met its burden to establish that the goats were subjected to neglect and cruel treatment while in the defendant's care. In its April 9, 2021 decision vesting temporary custody of the goats with the department, the court determined that the plaintiff met its burden to establish "reasonable cause" that the goats were neglected and cruelly treated by the defendant. In support of her claim on appeal, the defendant first argues that the court should have held the plaintiff to the burden of proving its claim by a fair preponderance of the evidence[15] but, instead, improperly applied a

---

[15] Proof by a preponderance of the evidence means, after a consideration of all the evidence fairly and impartially, there is enough evidence to produce "a reasonable belief that what is sought to be proven is more likely true than not true." (Internal quotation marks omitted.) *State* v. *Aviles*, 277 Conn. 281, 317, 891 A.2d 935, cert. denied, 549 U.S. 840, 127 S. Ct. 108, 166 L. Ed. 2d 69 (2006). Thus, to meet the fair preponderance of the evidence standard, the evidence had to induce a reasonable belief that it is more probable or

"minimal standard" of reasonable cause.[16] The defendant further argues that there was no evidence presented at the temporary custody hearing to support a finding that the goats were neglected or cruelly treated and, thus, that even the lower standard of reasonable cause was not met. We need not decide which standard applies to an order vesting temporary custody following a show cause hearing[17] because, even under the higher standard of a fair preponderance of the evidence, the defendant's claim fails.

We begin by setting forth our standard of review. "[T]he scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. When, however, the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Walters* v. *Servidio*, 227 Conn. App. 1, 29, 320 A.3d 1008 (2024). When, as in the present case,

likely than not that the goats were neglected or cruelly treated. See generally *State* v. *Reilly*, 60 Conn. App. 716, 725, 760 A.2d 1001 (2000).

[16] The reasonable cause standard is akin to that of probable cause. See *Karen* v. *Loftus*, 228 Conn. App. 163, 193, A.3d (2024); *Prioleau* v. *Commission on Human Rights & Opportunities*, 116 Conn. App. 776, 783, 977 A.2d 267 (2009). Probable cause "is a bona fide belief in the existence of facts essential under the law for the action and such as would warrant a [person] of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." (Emphasis omitted; internal quotation marks omitted.) *Adriani* v. *Commission on Human Rights & Opportunities*, 220 Conn. 307, 316, 596 A.2d 426 (1991).

[17] We note that the defendant has not adequately briefed her claim that the court applied the wrong standard. In light of the inadequate briefing, the plaintiff briefly counters this claim by asserting that the defendant incorrectly argues that a preponderance of the evidence standard applies and that the correct standard is the reasonable cause standard. We thus leave for another day our decision on this issue.

the resolution of a question of law "depends on underlying facts that are in dispute, that question becomes, in essence, a mixed question of fact and law. Thus, we review the subsidiary findings of historical fact . . . for clear error, and engage in plenary review of the trial court's application of . . . legal standards . . . to the underlying historical facts." (Internal quotation marks omitted.) *ASPIC, LLC* v. *Poitier*, 208 Conn. App. 731, 742, 267 A.3d 197 (2021).

In *State ex rel. Gregan* v. *Koczur*, 287 Conn. 145, 947 A.2d 282 (2008), our Supreme Court addressed the issue of what constitutes "neglect" for purposes of § 22-329a. In doing so, the court started "with the relevant language of [General Statutes (Rev. to 2005)] § 22-329a (a): 'The Chief Animal Control Officer, any animal control officer or any municipal or regional animal control officer may lawfully take charge of any animal found neglected or cruelly treated, in violation of sections 22-366, 22-415 and 53-247 to 53-252, inclusive, and shall thereupon proceed as provided in subsection (b) of this section . . . .' It is clear from this language that § 22-329a does not contain an independent standard of neglect but, instead, incorporates by reference the standards of the specific statutes enumerated therein. . . . [Section] 53-247 is the only statute listed in § 22-329a that applies to [the defendant's] conduct. Accordingly, to determine what constitutes neglect under § 22-329a under the circumstances of this case, we must look to the language of § 53-247. Section 53-247 provides in relevant part: '(a) Any person who . . . deprives of necessary sustenance . . . any animal, or who, having impounded or confined any animal, fails to give such animal proper care or . . . fails to supply any such animal with wholesome air, food and water, or . . . having charge or custody of any animal . . . fails to provide it with proper food, drink or protection from

the weather . . . shall be fined not more than one thousand dollars or imprisoned not more than one year or both. . . .' It is reasonable to conclude, therefore, that the neglect referred to in § 22-329a includes the failure to provide necessary sustenance, proper care, wholesome air, food and water under § 53-247 (a)." *State ex rel. Gregan* v. *Koczur*, supra, 153–54; see also *Bethlehem* v. *Acker*, 153 Conn. App. 449, 463, 102 A.3d 107 ("[i]t is reasonable to conclude that the neglect referred to in § 22-329a includes the failure to provide necessary protection from the weather"), cert. denied, 315 Conn. 908, 105 A.3d 235 (2014).

Applying the fair preponderance of the evidence standard to the present case, and on the basis of our careful review of the record relating to the two day evidentiary hearing held on March 30 and April 8, 2021, we conclude that the plaintiff presented sufficient evidence to produce a reasonable belief that it is more probable or likely than not that the goats were neglected or cruelly treated. DellaRocco testified to the information in his investigative report, which was admitted into evidence. Specifically, he testified to the poor conditions of the property observed during the preseizure surveillance, including that the shelters on the property were inadequate to house the goats, filled with manure and in a dilapidated condition with the roof caving in on one of them. He also testified to observing goats limping and having issues with their hooves and with walking, as well as to the large number of empty plastic water bottles on the property and to the fact that he never saw the defendant provide water to the goats during his surveillance. He explained that when the warrant was executed, he walked the entire property and confirmed his prior observations. He further testified that there was not enough room for every goat to be in a shelter.

State Animal Control Officer Tanya Wescovich provided testimony as well regarding a report she prepared following the investigation of the property, which was admitted as a full exhibit, and as to her observations of the goats having extremely long hooves, the excessive amount of manure piled up in the shelters, which caused her concern for the health of the goats, and the large number of empty plastic water bottles on the property to which the goats had access. She further testified that there were nine pregnant goats at the time of the seizure, that five of them gave birth to six kids in total, and that none of the kids would have survived without human intervention. Similar to DellaRocco's testimony, Wescovich testified that she did not see the defendant give water to the goats during her surveillance shifts, during which she observed ten to fifteen goats that were either limping or could not move properly. Wescovich explained that once she gained access to the property during the execution of the warrant, she became aware that even more goats had issues. Other witnesses who testified during the two day hearing included Nancy Jarvis-Deluca, a state animal control officer who participated in the execution of the warrant; Rosa Buonomo, the operator of an animal rescue; and the defendant. In addition to the exhibits entered into evidence that were previously mentioned, the exhibits before the court also included, inter alia, numerous photographs taken on the day of the seizure, which showed the condition of the property, shelters and goats; the search warrant application and supporting affidavit; a supplemental investigative report submitted by Jarvis-Deluca; and satellite images of the property.

The documentary and testimonial evidence presented shows that the defendant failed to provide the goats with adequate shelter, both in terms of space to shelter all the goats and for protection from high winds and cold weather; failed to give them sufficient access to

fresh water; failed to properly care for the goats' hooves by letting them become overgrown, which affected the mobility of the goats; and allowed the goats to live in unsanitary conditions with manure filled shelters and with dead goats in various stages of decomposition strewn about the property. That evidence was sufficient to demonstrate that it is more probable than not that the goats were not provided with proper care, drink and protection from the weather to establish neglect for purposes of § 22-329a. See *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 153–54;[18] *Bethlehem* v. *Acker*, supra, 153 Conn. App. 463. In her appellate brief, the defendant focuses much of her challenge to the court's finding of neglect on the fact that her goats were not identified to have any serious medical conditions and did not appear to be dehydrated so as to warrant their seizure. This court has determined previously, however, that "[n]owhere does our statutory, regulatory, or common-law scheme require an animal to be suffering from a present illness as a prerequisite to finding that the animal is neglected." *Bethlehem* v. *Acker*, supra, 467 n.12. Moreover, this claim ignores the court's factual findings that the goats not only endured extreme cruelty and neglectful conditions, but as many as forty to fifty of them died in the defendant's care as well.

We conclude that the plaintiff established that it is more probable than not that the goats were neglected

---

[18] In *State ex rel. Gregan* v. *Koczur*, supra, 287 Conn. 157–58, "the defendant was keeping forty-six live cats and one dead cat in a 950 square foot residence, much of which was so cluttered with personal effects, trash and bags of raw garbage that it was unusable. The [trial] court . . . found, and the evidence amply demonstrated, that the residence was, and had been for some time, in a 'deplorable, filthy, unsanitary [and] unhealthy' condition, with cat feces, vomit and urine present throughout. . . . [A] person of ordinary intelligence would know that confining forty-six cats in these unhealthy conditions constituted a failure to provide proper care for the cats under any reasonable standard." Our Supreme Court thus found that the defendant's conduct in allowing the cats to live in unsanitary and unhealthy conditions fell within the " 'unmistakable core of prohibited conduct' " and constituted neglect under § 22-329a. Id., 157.

or cruelly treated.[19] The defendant, therefore, has failed to demonstrate that the court incorrectly concluded that temporary custody of the goats should vest with the department.

## VI

The defendant's next two claims concern the court's April 9, 2021 order that, "[o]n or before April 16, 2021, the defendant shall relinquish ownership of the animals to the [plaintiff] or post a surety or cash bond with the [department] in the amount of [$500] per each of the sixty-four remaining live goats seized by the [plaintiff] to pay for the reasonable expenses in caring and providing for such animals . . . ." With respect to this order, the defendant claims that (1) she complied with the order to the extent that it required relinquishment of the goats by April 16, 2021, and (2) she complied with the bond requirement of the order. We disagree with both claims and address them in turn.

## A

The defendant first asserts that she complied with the order regarding relinquishment by filing a motion on April 16, 2021, in which she sought to "relinquish ownership of [her] goats for immediate release to qualified animal rescue facilities and individuals as identified by the defendant" (motion to relinquish). In connection with this claim, the defendant also appears to be arguing that the court did not issue a ruling in a timely manner and, ultimately, improperly denied her motion. We are not persuaded.

After the court issued its April 9, 2021 order requiring the defendant, by April 16, 2021, either to relinquish

---

[19] Of course, in light of our conclusion that the plaintiff established that it is more probable than not that the goats were neglected or cruelly treated, it necessarily follows that the court correctly determined that the plaintiff proved there was reasonable cause that the goats were neglected or cruelly treated.

ownership of the goats to the plaintiff or to post a surety or cash bond in the amount ordered, the defendant, instead, filed her motion to relinquish. Thereafter, the plaintiff filed a motion for an order requesting that the court vest permanent custody of the goats in the department as a result of the defendant's failure to relinquish ownership of the goats or to post a bond, as required by § 22-329a (f). In its written order granting the plaintiff's motion and vesting permanent custody of the goats with the department, the court stated that the language of its prior order was clear and unambiguous and "required the defendant to either relinquish control of the goats to the [plaintiff] or post surety or cash bond with the [department] in the amount of [$500] for each of the sixty-four remaining live goats, no later than April 16, 2021." The court further stated that the defendant's motion to relinquish "was *not* an offer to relinquish control of the goats to the [plaintiff]. As such, the defendant did not relinquish control of the goats to the [plaintiff] by the April 16, 2021 court deadline." (Emphasis in original.) The defendant's claim, therefore, appears to be challenging the court's finding, made in its order vesting permanent custody of the goats with the department, that the defendant had not complied with its April 9, 2021 order regarding relinquishment of the goats. That raises an issue of fact, which we review under the clearly erroneous standard of review. See *Meineke Bristol, LLC* v. *Premier Auto, LLC*, 227 Conn. App. 64, 73, 319 A.3d 826 (2024) ("A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed . . . . Our authority, when reviewing the findings of a judge, is circumscribed by the deference we must give to decisions of the trier of fact, who is usually in a superior position

to appraise and weigh the evidence. . . . The question for this court . . . is not whether it would have made the findings the trial court did, but whether in view of the evidence and pleadings in the whole record it is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.)).

The court's April 9, 2021 order, which tracked the language of § 22-329a (f), gave the defendant the choice between two options to be completed by April 16, 2021, namely, relinquish ownership of the goats to the plaintiff or post a surety or cash bond in the amount ordered. We agree with the court that filing a motion was not a proper response to the court's order. Moreover, the court was correct in finding that the motion to relinquish "was *not* an offer to relinquish control of the goats to the [*plaintiff*]." (Emphasis altered.) Rather, as the defendant states in her appellate brief, "[t]he motion [sought] to relinquish the goats with the single qualification that they be rehomed to facilities and individuals selected by the defendant." The addition of that qualification by the defendant, however, is contrary to the general rule that "[a]n order of the court must be obeyed until it has been modified or successfully challenged." (Internal quotation marks omitted.) *Celini* v. *Celini*, 115 Conn. App. 371, 382, 973 A.2d 664 (2009); see also *Eldridge* v. *Eldridge*, 244 Conn. 523, 530, 710 A.2d 757 (1998). In the present case, the defendant is improperly attempting, unilaterally, to modify the requirement of the court's order that she relinquish ownership of the goats to the *plaintiff* by adding the qualification that the goats be rehomed to a facility or individual of her choosing, which she cannot do, regardless of whether she believes any particular animal rescue is a more suitable environment for the goats. There is nothing in the statutory scheme governing the welfare of animals that allows the owner of a seized animal to decide or

direct where a seized animal must go following a finding of neglect or cruel treatment of the animal. The court's finding that the defendant did not relinquish ownership of the goats by April 16, 2021, is supported by the record and is not clearly erroneous.

To the extent that the defendant claims on appeal that the court did not decide her motion to relinquish in a timely manner and then improperly denied it, we conclude that such claims are inadequately briefed. The defendant has not cited any authority demonstrating that there was a time period in which the motion had to be decided or why the court's ultimate denial of the motion was improper.[20] "[F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . *State* v. *Buhl*, 321 Conn. 688, 724, 138 A.3d 868 (2016). Claims are inadequately briefed when they are merely mentioned and not briefed beyond a bare assertion. . . . Claims are also inadequately briefed when

---

[20] Instead, the defendant makes one reference to § 22-329a (g) (1), arguing that it "mandates that, once a judge has made a finding of neglect and cruel treatment, as Judge Cobb did in her April 9, 2021 order, she was under obligation to immediately vest ownership of the goats, as distinguished from temporary custody, in a [26 U.S.C.] § 501 (c) (3) facility permitted by law to care for neglected and cruelly treated animals, such as [the animal rescue she had suggested], with no prior hearing requirement, or a state, municipality or individual." This statute does not pertain to motions to relinquish or in any way explain why the court's denial of the defendant's motion was improper. Furthermore, we do not construe the statutory language as requiring the court to immediately vest ownership of the goats to an animal rescue of the defendant's choosing. The statute specifically provides that, "[i]f, after hearing, the court finds that the animal is neglected or cruelly treated, it shall vest ownership of the animal in *any state, municipal or other public or private agency which is permitted by law to care for neglected or cruelly treated animals* or with any person found to be suitable or worthy of such responsibility by the court." (Emphasis added.) General Statutes (Supp. 2022) § 22-329a (g) (1). The court complied with the statute when it exercised its discretion to vest ownership of the goats with the department.

they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record . . . .” (Internal quotation marks omitted.) *State* v. *Roberts*, 227 Conn. App. 159, 185–86, 320 A.3d 989 (2024). The defendant’s brief is devoid of citations to authority to support her assertions. Consequently, we decline to review these claims.

B

Next, the defendant claims that the court improperly determined that she failed to pay the bond ordered by the court pursuant to § 22-329a (f) within the deadline set by the court. Specifically, she argues that she complied with the order regarding the bond when she submitted a bank check to the plaintiff’s counsel by the deadline in the amount of $450 along with a letter, which identified nine goats. The defendant subsequently submitted payments totaling $5070, which she claims is a sufficient amount for ten of the goats. Our resolution of this claim requires little discussion.

As we stated, the court’s April 9, 2021 order provided the defendant with two options: relinquish ownership of the goats or pay a bond as set by the court. With respect to the bond issue, the court stated: “The total amount due, on or before April 16, 2021, pursuant to the court’s order, was $32,000. The defendant makes no claim that the $32,000 was paid.” There is no dispute in the record that the defendant did not pay the required amount by the April 16 deadline. On appeal, she argues first that she was not required to pay the bond because she relinquished ownership of the goats by way of her motion to relinquish. We already have rejected that claim. Because the defendant did not relinquish ownership of the goats, she was required to pay the $32,000 bond by April 16, 2021, which she failed to do. The defendant also makes a number of arguments about how the deadline to pay the bond was extended, by

which point she had made incremental deposits totaling more than $4500, which she claimed was sufficient to secure more than nine goats. The order, however, did not give the defendant the option to pay a bond in an amount that would cover only nine goats, beyond the deadline. Even if we were to agree, without deciding, that the deadline had been extended, the defendant never paid the required amount of the bond. Her claim, therefore, fails.[21]

## VII

The defendant next claims that § 22-329a is unconstitutional on its face and as applied in this case. We decline to review this claim due to inadequate briefing.

We begin by noting that, in her principal appellate brief, the defendant states that she challenged the constitutionality of § 22-329a by motion, which was denied. She then states: "The defendant asserts the unconstitutionality of the statute facially and as applied to her on appeal by incorporating the argument previously presented and presenting additional issues herein." Our rules of practice contain page and word limits for appellate briefs. See Practice Book §§ 67-3 and 67-3A. The defendant cannot sidestep those requirements by directing us in her appellate brief to arguments in support of her claim that are raised in another document. See *Robb* v. *Connecticut Board of Veterinary Medicine*, 204 Conn. App. 595, 612, 254 A.3d 915 (2021) ("The plaintiff's attempt to incorporate by reference his amended verified complaint into his principal appellate brief is not procedurally proper. As is apparent in this case, permitting legal claims to be incorporated by reference into an appellate brief would, among other

---

[21] There is also no merit to the defendant's claim that she paid a sufficient bond pursuant to Practice Book § 38-8, which pertains to cash bail in criminal matters, as the present case is controlled by the bond provision set forth in § 22-329a (f).

things, enable litigants to circumvent the page limitations set forth in Practice Book § 67-3. See, e.g., *Papic* v. *Burke*, 113 Conn. App. 198, 217 n.11, 965 A.2d 633 (2009) ('it is not permissible to use [an] appendix [to an appellate brief] either to set forth argument or to evade the thirty-five page limitation provided in Practice Book § 67-3 and already met by the [appellant's] brief')." (Footnote omitted.)), cert. denied, 338 Conn. 911, 259 A.3d 654 (2021).

In her principal appellate brief, the defendant argues that § 22-329a is unconstitutional on its face, stating that "[t]he statute suffers from constitutional defects in addition to those cited . . . in her motion" and listing the alleged defects. According to the defendant, the statute, on its face and as applied, denies "fundamental freedoms and protections from abusive conduct by the state in violation of the first, fourth, eighth and fourteenth amendments."

In her appellate brief, the defendant devotes a few sentences to a short paragraph to each of these claimed grounds challenging the statute's constitutionality, with no citation to authority. She also fails to include any relevant law concerning what must be shown to establish that a statute is unconstitutional on its face or as applied. In all, the defendant devotes three pages of her appellate brief to her challenge to the constitutionality of § 22-329a on all of these grounds and pursuant to the first, fourth, eighth and fourteenth amendments to the federal constitution. As our Supreme Court has cautioned, "[a]lthough the number of pages devoted to an argument in a brief is not necessarily determinative, relative sparsity weighs in favor of concluding that the argument has been inadequately briefed. This is especially so with regard to first amendment and other constitutional claims, which are often analytically complex. See, e.g., *Schleifer* v. *Charlottesville*, 159 F.3d 843,

871–72 (4th Cir. 1998) ('[f]irst [a]mendment jurisprudence is a vast and complicated body of law that grows with each passing day' and involves 'complicated and nuanced constitutional concepts'), cert. denied, 526 U.S. 1018, 119 S. Ct. 1252, 143 L. Ed. 2d 349 (1999); *Missouri* v. *National Organization for Women, Inc.*, 620 F.2d 1301, 1326 (8th Cir.) (first amendment issues are 'complex'), cert. denied, 449 U.S. 842, 101 S. Ct. 122, 66 L. Ed. 2d 49 (1980); see also *In re Melody L.*, 290 Conn. 131, 154–55, 962 A.2d 81 (2009) (one and one-half page equal protection claim was inadequate), overruled on other grounds by *State* v. *Elson*, 311 Conn. 726, 746–47, 91 A.3d 862 (2014); *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, [266 Conn. 108, 120, 830 A.2d 1121 (2003)] (claim under takings clause was inadequately briefed when plaintiff provided 'no authority or analysis in support of its specific claim'); *In re Shyliesh H.*, 56 Conn. App. 167, 181, 743 A.2d 165 (1999) (attempt to brief two constitutional claims in two and one-half pages was inadequate)." *State* v. *Buhl*, supra, 321 Conn. 726. We conclude that the defendant has not adequately briefed her claim challenging the constitutionality of § 22-329a, both on its face and as applied to her. Therefore, we decline to review this claim.

## VIII

The defendant's last claim is that the court improperly dismissed her counterclaim. We are not persuaded.

The following additional facts are relevant to our resolution of this claim. In her counterclaim dated May 3, 2022, the defendant made a number of claims, which can be summarized as follows: (1) the defendant's fourth amendment rights were violated because the affidavit submitted by DellaRocco in support of the search warrant omitted material facts and contained false statements and because the verified petition did

not plainly state the facts of neglect and cruel treatment as required by § 22-329a (c); (2) the department violated § 22-329a (i) by allowing favored individuals priority to adopt the goats; (3) the department violated the defendant's due process rights by providing false testimony at the hearing before Judge Cobb held on March 30 and April 8, 2021; (4) the defendant's first amendment rights were violated by the commencement of these proceedings in retaliation for the defendant's speech; and (5) § 22-329a is unconstitutional on its face and as applied to the defendant and infringes on the defendant's first amendment rights. The relief sought in the counterclaim included the "return of the goats, a declaratory judgment that § 22-329a is unconstitutional, and the extinguishment of all demands for bonds or other monetary payments." The plaintiff moved to dismiss the counterclaim on four grounds, namely, that the counterclaim was (1) barred by sovereign immunity, (2) barred by the prior pending action doctrine, (3) untimely and (4) not properly brought in this in rem proceeding. The court based its decision dismissing the counterclaim on the grounds of sovereign immunity and the prior pending action doctrine. We therefore limit our discussion regarding this claim to those two grounds and address them in turn.

A

The court granted the motion to dismiss on the ground of sovereign immunity only with respect to three of the five claims asserted in the counterclaim.[22] The court concluded that the three claims did not allege sufficient facts to bypass sovereign immunity or to show

[22] The court declined to grant the motion to dismiss on the ground of sovereign immunity as to the defendant's first two claims of violations of the fourth amendment and § 22-329a (i). Nevertheless, as to those two claims, the court granted the motion to dismiss on the ground that the claims were precluded under the prior pending action doctrine, which we address in part VIII B of this opinion.

that an exception to the state's sovereign immunity applied, in that the claims failed to set forth a substantial claim that the defendant's constitutional rights were violated.

The defendant's briefing on this issue consists of three short paragraphs. She first appears to suggest that, because the trial court declined to grant the motion to dismiss on the basis of sovereign immunity as to two of the grounds raised in the counterclaim, sovereign immunity did not justify dismissal of the other three grounds in the counterclaim. Next, the defendant asserts that dismissal of the counterclaim should have been raised, if at all, by way of a motion to strike, rather than a motion to dismiss, because, according to the defendant, the issues raised in the motion to dismiss concerned the sufficiency of the allegations pursuant to Practice Book § 10-39, not the jurisdiction of the court. See Practice Book § 10-30. Aside from referencing those two rules of practice, the defendant provided no other citation to authority to support her assertions, and her brief lacks any analysis of applicable law concerning sovereign immunity or any exceptions thereto, including how any exception to the state's sovereign immunity applies to her claims.[23] As we have stated

[23] "The principle that the state cannot be sued without its consent, or sovereign immunity, is well established under our case law. . . . It has deep roots in this state and our legal system in general, finding its origin in ancient common law. . . . Not only have we recognized the state's immunity as an entity, but [w]e have also recognized that because the state can act only through its officers and agents, a suit against a state officer concerning a matter in which the officer represents the state is, in effect, against the state. . . . Exceptions to this doctrine are few and narrowly construed under our jurisprudence. . . . *Chief Information Officer* v. *Computers Plus Center, Inc.*, 310 Conn. 60, 79–80, 74 A.3d 1242 (2013)." (Internal quotation marks omitted.) *Jakobowski* v. *State*, 219 Conn. App. 839, 848, 296 A.3d 226 (2023). "[T]he doctrine of sovereign immunity implicates subject matter jurisdiction and is therefore a basis for granting a motion to dismiss." (Internal quotation marks omitted.) *Spillane* v. *Lamont*, 350 Conn. 119, 126, A.3d    (2024).

"It is . . . well established that [t]he sovereign immunity enjoyed by the state is not absolute." (Internal quotation marks omitted.) *Dept. of Public Health* v. *Estrada*, 349 Conn. 223, 237, 315 A.3d 1081 (2024). Indeed, "[o]ur

previously in this opinion, "[c]laims are . . . inadequately briefed when they . . . consist of conclusory assertions . . . with no mention of relevant authority and minimal or no citations from the record"; (internal quotation marks omitted) *Wells Fargo Bank, N.A.* v. *Caldrello*, 192 Conn. App. 1, 35, 219 A.3d 858, cert. denied, 334 Conn. 905, 220 A.3d 37 (2019); and "parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited." (Internal quotation marks omitted.) *Vaccaro* v. *D'Angelo*, 184 Conn. App. 467, 488, 195 A.3d 443 (2018). In the present case, the defendant's brief on this issue contains no meaningful analysis of how the court's dismissal of a portion of the counterclaim on the ground of sovereign immunity was improper, nor does it cite to relevant legal principles or analyze how the facts of this case relate to any applicable law. As a result of the defendant's inadequate briefing,[24] we decline to review

case law has identified three recognized exceptions to sovereign immunity: '(1) when the legislature, either expressly or by force of a necessary implication, statutorily waives the state's sovereign immunity . . . (2) when an action seeks declaratory or injunctive relief on the basis of a substantial claim that the state or one of its officers has violated the plaintiff's constitutional rights . . . and (3) when an action seeks declaratory or injunctive relief on the basis of a substantial allegation of wrongful conduct to promote an illegal purpose in excess of the officer's statutory authority.' " *Spillane* v. *Lamont*, supra, 350 Conn. 127. Relevant to this appeal are the second and third exceptions. "For a claim made pursuant to the second exception, complaining of unconstitutional acts, [our Supreme Court] require[s] that [t]he allegations of such a complaint and the factual underpinnings if placed in issue, must clearly demonstrate an incursion upon constitutionally protected interests. . . . For a claim under the third exception, the plaintiffs must do more than allege that the defendants' conduct was in excess of their statutory authority; they also must allege or otherwise establish facts that reasonably support those allegations. . . . In the absence of a proper factual basis in the complaint to support the applicability of these exceptions, the granting of a motion to dismiss on sovereign immunity grounds is proper." (Citations omitted; internal quotation marks omitted.) *Columbia Air Services, Inc.* v. *Dept. of Transportation*, 293 Conn. 342, 350, 977 A.2d 636 (2009).

[24] For similar reasons, we also decline to review the defendant's claim that the court should have granted her motion to open and vacate the judgment rendered in favor of the plaintiff on the ground of fraud. Like with many of her other claims on appeal, the defendant has provided no citation

her claim that the court improperly dismissed her counterclaim, in part, on the ground of sovereign immunity.

B

We next turn to the defendant's claim that the court improperly dismissed her counterclaim, in part, on the basis of the prior pending action doctrine. Although the defendant's briefing of this claim also is minimal, the defendant clearly raises two grounds for challenging the court's decision to dismiss a portion of her counterclaim on the basis of the prior pending action doctrine, namely, that the prior pending action doctrine "does not apply because one of its key elements—identity of parties—is not met" and because the two actions seek different relief. We disagree.

The following additional facts are relevant to this claim. Prior to filing her counterclaim, the defendant commenced an action in the Superior Court on April 6, 2021, against a number of parties, including the department, alleging a variety of claims regarding the seizure of the goats from her property. See *Burton* v. *Mason*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. CV-21-5028294-S (*Mason* action). That action is still pending in the Superior Court. In the present case, in granting the motion to dismiss, in part, on the basis of the prior pending action doctrine, the court stated: "[T]he department argues that the counterclaim is virtually identical

to authority to support her claim, let alone an analysis of relevant authority as it pertains to her claim. Instead, in two short paragraphs, she makes unfounded allegations about alleged retaliatory conduct of the trial judge. In its order denying the motion to open and vacate, the court cautioned the defendant "not to assert a claim unless there is a basis in law and fact for doing so that is not frivolous" and that "personal attacks on the court are inappropriate and will not be tolerated" and may subject the defendant to sanctions, should she continue to assert groundless claims. We echo those words of caution and remind the defendant that unsupported accusations that have no basis in fact or law cannot be properly considered by this court and have no place in proceedings before this court.

to the pending claims against the department in [the *Mason* action]. The remaining claims are that the department violated the [defendant's] fourth amendment rights when DellaRocco lied in his affidavit to obtain a search warrant and that the department violated § 22-329a (i) by allowing favored individuals priority to adopt the goats. In [the *Mason* action], the [defendant] brings these exact same claims. Although the relief sought is slightly different, as the [defendant] seeks monetary damages in [the *Mason* action] but not in the present case, and declaratory relief in the present case but not in [the *Mason* action], the actions are still virtually identical. In such instances, the court has discretion to decide whether the circumstances justify dismissal. In the present case, the circumstances clearly justify dismissal. The counterclaim is yet another transparent attempt to relitigate Judge Cobb's order of temporary care and custody. The [defendant] has already filed a motion to disqualify Judge Cobb, a motion to vacate, a motion to reopen the hearing, a motion to reargue, a motion to declare . . . § 22-329a unconstitutional, a motion to suppress and for return of property, and a motion for immediate release of her goats, as well as motions to reargue these motions. Given the blatantly 'oppressive and vexatious' nature of the counterclaim, dismissal under the prior pending action doctrine is justified. Any claims that the [defendant] may have against the department and its agents can be adjudicated in the [*Mason* action]."

We next set forth the legal principles and standard of review that govern our resolution of this claim. "[T]he prior pending action doctrine permits the court to dismiss a second case that raises issues currently pending before the court. The pendency of a prior suit of the same character, between the same parties, brought to obtain the same end or object, is, at common law, good cause for abatement. It is so, because there cannot be

any reason or necessity for bringing the second, and, therefore, it must be oppressive and vexatious. This is a rule of justice and equity, generally applicable, and always, where the two suits are virtually alike, and in the same jurisdiction. . . . The policy behind the doctrine is to prevent unnecessary litigation that places a burden on crowded court dockets." (Internal quotation marks omitted.) *Cameron* v. *Santiago*, supra, 223 Conn. App. 840 n.3.

"Under the prior pending action doctrine, the court must determine whether the two actions are: (1) exactly alike, i.e., for the same matter, cause and thing, or seeking the same remedy, and in the same jurisdiction; (2) virtually alike, i.e., brought to adjudicate the same underlying rights of the parties, but perhaps seeking different remedies; or (3) insufficiently similar to warrant the doctrine's application. . . . If the two actions are exactly alike or lacking in sufficient similarities, the trial court has no discretion. In the former case, the court must dismiss the second action, and in the latter instance, the court must allow both cases to proceed unabated. Where the actions are virtually, but not exactly alike, however, the trial court exercises discretion in determining whether the circumstances justify dismissal of the second action." (Internal quotation marks omitted.) *Loch View, LLC* v. *Windham*, 211 Conn. App. 765, 772–73, 274 A.3d 140 (2022). "In order to determine whether the actions are virtually alike, we must examine the pleadings . . . to ascertain whether the actions are brought to adjudicate the same underlying rights of the parties. . . . The trial court's conclusion on the similarities between the cases is subject to our plenary review." (Internal quotation marks omitted.) *Rousseau* v. *Weinstein*, 204 Conn. App. 833, 844, 254 A.3d 984 (2021). We also note that "a motion to dismiss is the proper vehicle to raise the issue of a prior pending action"; (internal quotation marks omitted)

*A1Z7, LLC* v. *Dombek*, 188 Conn. App. 714, 722 n.2, 205 A.3d 740 (2019); and that "[t]he prior pending action doctrine applies equally to claims and counterclaims." *Conti* v. *Murphy*, 23 Conn. App. 174, 178, 579 A.2d 576 (1990).

Because these claims are seeking different remedies, we examine the pleadings in both actions to determine whether they have been brought to adjudicate the same underlying rights of the parties. The two claims in the counterclaim that were dismissed on the basis of the prior pending action doctrine alleged a violation of the defendant's fourth amendment rights stemming from the allegedly illegal search of her property and a violation of § 22-329a (i) by the department. Our review of the pleadings in the *Mason* action demonstrates that those very same claims have been raised against the department in that action. Like in the counterclaim in the present case, the defendant alleges in the *Mason* action that the department violated her fourth amendment rights because DellaRocco lied in his testimony at the hearing on March 30, 2021, his affidavit included false statements and omitted facts, and the search of her property was illegal and was not supported by probable cause. She also alleges in the *Mason* action that the department violated § 22-329a (i).

We conclude, following our review of the record before us, that the present case and the *Mason* action both stem from the same factual circumstance—the seizure of the goats from the defendant—and involve the same parties and identical claims. Even though the relief sought in both actions is not identical, both actions seek the same goals or objectives, namely, to adjudicate the defendant's rights and the propriety of the seizure of the goats and the proceedings that followed. See *Lodmell* v. *LaFrance*, 154 Conn. App. 329, 335, 107 A.3d 975 (2014) (" '[T]he applicability of the doctrine does not turn on the issue of whether the two

actions seek the same remedy. . . . The key question is whether the two actions are brought to adjudicate the same underlying rights.' "), cert. denied, 315 Conn. 921, 107 A.3d 959 (2015). Moreover, the defendant's argument that the doctrine does not apply to the present case because the parties are not identical fails in light of this court's decision in *Modzelewski* v. *William Raveis Real Estate, Inc.*, 65 Conn. App. 708, 783 A.2d 1074, cert. denied, 258 Conn. 948, 788 A.2d 96 (2001). In that case, the defendant raised a similar argument, which this court rejected, concluding that, "[w]hile the parties are not 'identical' in that there are two additional parties to the prior action, the identical parties to the present action are involved in the prior one." Id., 714. The reasoning in *Modzelewski* applies equally to the present case; the parties in the present action are both involved in the *Mason* action, and the fact that there are additional defendants in the *Mason* action does not preclude application of the prior pending action doctrine to the present case. See id. Accordingly, we agree with the court that both actions are virtually alike. We further conclude that the court did not abuse its discretion in determining that the circumstances justified dismissal, in part, of the counterclaim against the department in the present case on the basis of the prior pending action doctrine.

The judgments are affirmed.

In this opinion the other judges concurred.